14-903(L)
United States v. Gioeli, Saracino

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

August Term, 2014

(Argued: April 30, 2015      Decided: August 5, 2015)

Docket Nos. 14-903-cr, 14-1649-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

- v. -

JOEL CACACE, JOHN CAPOLINO, AKA Johnny Cop, NICHOLAS BOVA, FRANK CAMPIONE, AKA Frankie Camp, JOSEPH COMPETIELLO, AKA Joey Caves, DINO CALABRO, AKA Big Dino, ANGELO GIANGRANDE, ORLANDO SPADO, AKA Ori Spado, JOSEPH DIGORGA, MICHAEL CATAPANO, CHRISTOPHER CURANOVIC, JOHN FRANZESE, AKA Sonny Franzese,

*Defendants,*

THOMAS GIOELI, AKA Tommy Shots, AKA Tommy Machines, DINO SARACINO, AKA Dino Little,

*Defendants-Appellants.*

_____

Before:        JACOBS, POOLER, and HALL, *Circuit Judges.*

Appeal from judgments entered by the United States District Court for the Eastern District of New York (Cogan, *J.*). Defendants-appellants were convicted of crimes committed as members of the Colombo crime family. On appeal, defendant Thomas Gioeli argues that there was insufficient evidence to support his conviction for racketeering conspiracy; that the government failed to disclose statements made by a confidential source until after trial in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); that the government seized materials from his home in violation of his Fourth Amendment rights, and the materials should therefore have been suppressed; that two of the three racketeering predicate acts that the jury found to have been proven against him were multiplicitous; and that the

government's conduct throughout the investigation and prosecution of this case was so outrageous that it violated his due process rights. Defendant Dino Saracino argues that the government failed to disclose relevant evidence in violation of *Brady*; that the district court erred in denying his motion to sever his trial; and that the district court erred in sentencing him when it took into account crimes for which he had been acquitted. Defendants seek a judgment of acquittal, or in the alternative, a new trial. We AFFIRM the judgment and all related orders entered by the district court.

AFFIRMED.

---

ELIZABETH A. GEDDES (James D. Gatta and David C. James, *on the brief*), Assistant United States Attorneys, *for* Kelly T. Currie, Acting United States Attorney for the Eastern District of New York, Brooklyn, NY, *for Appellee.*

ADAM D. PERLMUTTER (Daniel A. McGuinnes, *on the brief*), New York, NY, *for Defendant-Appellant* Thomas Gioeli.

SAMUEL M. BRAVERMAN (Jennifer B. Arlin, *on the brief*), Fasulo Braverman & DiMaggio, Bronx, NY, *for Defendant-Appellant* Dino Saracino.

---

PER CURIAM:

Defendants-appellants Thomas Gioeli and Dino Saracino appeal from judgments entered by the United States District Court for the Eastern District of New York (Cogan, *J.*). Defendants were convicted of crimes they committed as members of the Colombo crime family. On appeal, Gioeli argues that there was insufficient evidence to support his conviction for racketeering conspiracy; that the government suppressed statements made by a confidential source until after trial in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); that

2

the government seized materials from his home in violation of his Fourth Amendment rights, and the materials should therefore have been suppressed; that two of the three racketeering predicate acts the jury found to have been proven against him were multiplicitous; and that the government's conduct throughout the investigation and prosecution of this case was so outrageous that it violated his due process rights. Saracino argues that the government violated his due process rights under *Brady*; that the district court erred in denying his motion to sever his trial; and that the district court violated his constitutional rights at sentencing by taking into account crimes for which he had been acquitted and a crime for which he had not been charged. Defendants seek a judgment of acquittal, or in the alternative, a new trial.

We resolve all of defendants' arguments in the government's favor, and AFFIRM the judgment and all contested decisions issued by the district court.

## BACKGROUND

In May 2008, a grand jury in the Eastern District of New York returned a superseding indictment ("S-1 indictment") against several individuals alleged to be members of the Colombo crime family, including defendants-appellants Thomas Gioeli and Dino Saracino as well as Joseph Competiello and Dino Calabro.

The S-1 indictment included the following allegations. The Colombo crime family operates in the New York City area and is part of a national crime syndicate known as La Cosa Nostra or the mafia. The mafia is a highly structured organization, and its families operate under a formal internal hierarchy. "Associates" occupy the lowest rung. An associate

3

who is able to survive the often bloody internal politics of the mafia can eventually be selected to become a formal member of the family through a process known as getting "made." Newly minted members are commonly referred to as "soldiers." The family is organized into groups of associates and soldiers known as "crews." Each crew is run by a "captain," who is responsible for supervising the criminal activities of his crew. The captain provides the members of his crew with support and protection in exchange for a share of each member's earnings. At the top of the pyramid is the "boss." The boss is assisted by an "underboss" and a counselor, or "consigliore," and is responsible for setting policy, resolving internal and external disputes, and approving all significant actions.

According to the government's theory of the case and testimony elicited at trial, the relationships of defendants with each other and their involvement with the Colombo family are as follows. Gioeli is a longtime member of the family and was made a captain by the mid-1990s. Calabro, Saracino, and Competiello were associates under Gioeli throughout the 1990s. Calabro became a member in 2000 and was made a captain shortly thereafter. Saracino and Competiello became members in 2004, at which time Saracino reported to Calabro, and Competiello reported to Gioeli. In the mid-2000s, Gioeli became "captain of all captains," a position he held until his arrest under the S-1 indictment in June 2008.

The landscape of this prosecution was in flux during the months after the filing of the S-1 indictment as the government continued its investigation of the Colombo family. Calabro and Competiello began cooperating with the government, and the individuals named as defendants and the charges against them evolved through a series of superseding

4

indictments filed in June 2008 ("S-2 indictment"), December 2008 ("S-4 indictment"), and July 2010 ("S-6 indictment"). The S-6 indictment includes eight counts and charged Gioeli and Saracino as defendants.[1] Count One charged Gioeli and Saracino with Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(c), and alleged that Gioeli and Saracino engaged in nine and eleven predicate racketeering acts, respectively. The racketeering acts relevant to this appeal are: Racketeering Act 2A, conspiracy to murder Frank Marasa, charged against Gioeli; Racketeering Act 3, conspiracy to murder members of the Orena faction of the Colombo family, charged against Gioeli and Saracino; Racketeering Act 5A, conspiracy to murder John Minerva, charged against Gioeli; and Racketeering Act 9, murder of and conspiracy to murder Richard Greaves, charged against Gioeli and Saracino. Both defendants were also charged with substantive counts of Murder in-aid-of Racketeering for the deaths of Richard Greaves (Count Two), Ralph Dols (Count Three), and William Cutolo (Count Four). In addition, Saracino was charged with Extortionate Extension of Credit Conspiracy (Count Five), Prevention of Testimony (Count Six), Withholding Testimony and Records (Count Seven), and Obstruction of Grand Jury Proceedings (Count Eight).

Among the numerous pretrial motions filed in this case was a motion by Saracino for severance, or in the alternative to empanel a separate jury to determine his guilt—a motion the court denied. The trial began on March 19, 2012 and lasted for several weeks. The parties called dozens of witnesses, including several government cooperators. The jury returned its

---

[1] The S-6 indictment also charged Joel Cacace, who was believed to be consigliore at the time. In July 2011, the grand jury returned a superseding indictment ("S-7 indictment") pertaining to Cacace alone. Cacace was tried separately from his former codefendants, Gioeli and Saracino, and was ultimately acquitted of Murder in-aid-of Racketeering, the sole crime for which he was charged.

5

verdict on May 9, 2012. Gioeli and Saracino were both found guilty of Racketeering

Conspiracy based on the jury's finding that the government had proven each defendant's

participation in at least two racketeering acts. Specifically, the jury found that the

government had proven three racketeering acts against Gioeli (conspiracy to murder Marasa,

conspiracy to murder members of the Orena faction, and conspiracy to murder Minerva)

and five racketeering acts against Saracino (conspiracy to murder members of the Orena

faction, two acts of extortionate extension of credit, conspiracy to murder Michael Burnside,

and witness tampering). The jury found Gioeli not guilty on all other counts, and found

Saracino guilty on Counts Five through Eight.

In June 2012, Gioeli filed a motion for judgment of acquittal or for a new trial under

Rules 29 and 33 of the Federal Rules of Criminal Procedure, arguing, *inter alia*, that the trial

evidence was insufficient to support the verdict, and that Racketeering Acts 3 and 5A were

multiplicitous and therefore violated his rights under the Double Jeopardy Clause of the

Fifth Amendment.[2] In July 2013, the district court denied the motion in all respects. In May

and June of 2013, however, the government had disclosed statements from a confidential

source related to the murders of Greaves and Marasa. Thus, in August 2013, each defendant

filed a second Rule 33 motion arguing that his guilty verdict should be vacated and a new

trial granted on the ground that the prior non-disclosure of evidence constituted a due

---

[2]      Saracino also filed a motion under Rules 29 and 33, which the court denied. Saracino's motion raised no arguments that are relevant to this appeal that were not also raised at other times during the proceedings in the district court.

process violation of the sort identified in *Brady*. The court denied the motions in October 2013.

Gioeli received a below-guidelines sentence of 224 months' incarceration. In Saracino's case, the court imposed the statutory maximum term for each count of conviction and ran several of those sentences consecutively, which yielded a final sentence of 50 years' imprisonment. When marshalling and evaluating the factors that must be taken into account pursuant to 18 U.S.C. § 3553(a), the district court found, over Saracino's objection, that Saracino was involved in the murders of Greaves, Dols, and Cutolo, of which he was acquitted, and the murder of Joseph Scopo, for which he had never been charged.[3]

Defendants raise a number of issues on appeal. Gioeli argues: (1) his guilty verdict was not supported by sufficient evidence; (2) the government's failure to disclose statements by a confidential source until after trial constituted a *Brady* violation; (3) the government's seizure of certain materials from his home violated the Fourth Amendment, and those materials should have been suppressed; (4) two of the three racketeering acts the jury found to have been proven against him were multiplicitous; and (5) the government's conduct throughout the investigation and prosecution of this case was so outrageous that it violated his due process rights. Saracino also challenges the district court's *Brady* ruling and further argues: (1) the court erred in denying his motion for severance; and (2) the court violated his constitutional rights at sentencing by, *inter alia*, taking into account uncharged crimes and

---

[3]  The court indicated that it would reach this finding using either the preponderance of the evidence standard or the clear and convincing evidence standard.

crimes of which he had been acquitted, and erred by doing so without holding a hearing pursuant to *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979).

We affirm in all respects.

**DISCUSSION**

### I.      Defendants' *Brady* Arguments

After trial, the government disclosed statements from a confidential source about the murders of Marasa and Greaves. The government ultimately provided six audio recordings made by the confidential source and a series of proffer notes handwritten by Drug Enforcement Administration agents documenting their interviews with the confidential source. Gioeli and Saracino claimed that the government's withholding of this evidence violated *Brady* and moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. The district court denied the motions, finding that no prejudice ensued from the government's nondisclosure. In view of defendants' explanations of how they would have used this evidence at trial, we agree with the district court.

Under *Brady*, "the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2011) (citing *Brady*, 373 U.S. at 87). "[A] *Brady* violation occurs only where the government suppresses evidence that 'could reasonably [have been] taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). Accordingly, even when the government fails to disclose favorable information to the

8

defense, a *Brady* violation still requires "a '*reasonable probability*' that a different verdict would have resulted from disclosure of the information that the defendant claims was suppressed." *United States v. Rodriguez*, 496 F.3d 221, 227 (2d Cir. 2007) (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)).

Gioeli focuses on aspects of the undisclosed material that suggest Jimmy Calderone and Joseph Competiello were part of the conspiracy to murder Marasa, a conspiracy in which Gioeli was found to have participated—charged as Racketeering Act 2A. Gioeli argues that this evidence favors him for two reasons. First, Calderone and Competiello's participation in the murder would demonstrate that the murder was not carried out in the way the government claims Gioeli had instructed. If credited by the jury, this fact would undermine the government's underlying argument that Gioeli was in fact involved in the murder. Second, Gioeli argues that he could have used this evidence to impeach government witnesses who did not name Calderone and Competiello as participants in the Marasa murder. Neither argument supports the conclusion that the outcome of the trial would have been any different if the materials had been disclosed.

The participation of additional people in the murder is not inconsistent with the government's account of the Marasa murder. According to the government's case, Gioeli had an important but limited role in the murder: approving it, rendering advice to the murderers, and receiving updates. True, one witness testified that Gioeli advised "[h]ow it was to be done, and who was going to be shooting, and stuff like that," Trial Tr. 968, and that Gioeli suggested they invite the brother of the man Marasa had killed to participate in

9

the murder. The government, however, argued only that Gioeli was "aware" of the participants. Trial Tr. 5350. Participation in Marasa's murder by additional individuals does not bear upon whether Gioeli did what the government argued he did.

The argument that Gioeli's trial counsel could have used the undisclosed material to impeach government witnesses who omitted Calderone and Competiello from their accounts of Marasa's murder fails because this evidence was merely cumulative. Years before the trial began, the government had disclosed a statement by a different government cooperator that did list Competiello as one of the participants in the Marasa murder. Gioeli's trial counsel also elicited testimony that Competiello was arrested for that murder. Although the identification of Competiello and Calderone by the confidential source may have added weight to this impeachment evidence, timely disclosure would not have provided any new basis on which to impeach the witnesses who omitted those two names from their accounts of the murder. The untimely disclosure was therefore not prejudicial and does not undermine our confidence in the jury's finding as to Racketeering Act 2A.

Saracino's *Brady* argument is based on the confidential source's undisclosed statement regarding the location of Greaves's murder.[4] Calabro and Competiello testified at trial that

---

4      Saracino was not charged with Racketeering Act 2, which included the murder of (Racketeering Act 2B) and conspiracy to murder (Racketeering Act 2A) Frank Marasa. Saracino nonetheless advanced a *Brady* argument in the district court based on the theory that Marasa was murdered as part of the conspiracy to murder Orena faction members, which was charged as Racketeering Act 3 and found to have been proven against both defendants. The government did not indicate which members of the Orena faction were targeted by the conspiracy. Saracino did not expressly renew this argument on appeal, although he did claim, erroneously, that he had been charged with the murder of Frank Marasa. Saracino's Br. 17. To the extent that Saracino advances a *Brady* argument pertaining to Marasa's murder, that argument is inapposite because he was not charged with that crime. Any such argument also fails for lack of prejudice because the government

Greaves was murdered in Saracino's basement. According to notes from a proffer session, however, the confidential source told the government that Greaves was murdered in Competiello's basement. Saracino argues that the confidential source's account would have been powerful impeachment evidence. This evidence, however, would have been cumulative of other evidence that was in Saracino's possession that could have been used for the same impeachment purpose—namely a statement made by a different confidential source that Greaves was murdered somewhere other than in Saracino's basement. Any claim of prejudice is further vitiated by the fact that the jury ultimately found that the government failed to prove that Saracino conspired to murder Greaves.[5] Because Saracino was not prejudiced by the untimely disclosure of this evidence, a new trial is not warranted.

## II.    Gioeli's Multiplicity Argument

Gioeli argues that Racketeering Act 5A, conspiracy to murder Minerva, contains no legal or factual element that is not contained in Racketeering Act 3, conspiracy to murder Orena faction members, and that the former is therefore multiplicitous of the latter and should be stricken. Although the government contests this argument on the merits, it also

introduced considerable evidence of Saracino's involvement in several aspects of the Orena conspiracy that were unrelated to Marasa's murder.

[5]      In his reply brief, Saracino argues that the untimely disclosure of these materials was prejudicial because although the jury found the government had not proven his involvement in the Greaves's murder, the district court's sentence was based in part on its finding to the contrary. We disagree with this contention. The district court did find, by both a preponderance and by clear and convincing evidence, for § 3553(a) purposes, that Saracino was involved with Greaves's murder. The court explicitly based that finding on the testimony of defendant Saracino's brother, Sebastian Saracino. Sebastian testified that he was present in his brother's basement when his brother shot Greaves in the head. Although the jury did not have access to the confidential source's nondisclosed statement in reaching its verdict, at the time of sentencing in April 2014, the district court was well aware of that statement, having ruled on defendants' *Brady* arguments in October 2013.

11

asserts that Gioeli waived any multiplicity argument by failing to raise it prior to trial and that the multiplicity claim is moot because Gioeli's conviction for racketeering conspiracy is still supported by the jury's finding that the government proved the requisite two racketeering acts. The district court ruled that because racketeering acts implicate double jeopardy, Gioeli's multiplicity claim had not been waived under this Court's decision in *United States v. Chacko*, 169 F.3d 140 (2d Cir. 1999). There we held that Rule 12 of the Federal Rules of Criminal Procedure does not "bar a double jeopardy argument qua multiplicity argument when it is made to the district court in a posture other than that of a pre-trial motion," and that such an argument "'may' be made as part of a pre-trial motion or it can be made at a later time." *Id.* at 146 (quoting Fed. R. Crim. P. 12). Ruling on the merits, the district court concluded, nonetheless, that the two conspiracies identified as predicate acts had different objectives and were thus not multiplicitous.

On appeal, the government advances forceful arguments for reversing the district court's decision on the waiver issue,[6] and Gioeli does the same with respect to the court's

---

[6] Although we do not address the government's waiver argument, we acknowledge the novel legal question to which the district court's ruling on the issue of waiver is addressed: whether double jeopardy is implicated when a defendant claims that racketeering acts are multiplicitous. We are skeptical of the district court's affirmative answer to this question.

At the heart of the Fifth Amendment's Double Jeopardy Clause is the concept that "courts may not impose more than one punishment for the same offense and prosecutors ordinarily may not attempt to secure that punishment in more than one trial." *Brown v. Ohio*, 432 U.S. 161, 165 (1977). Thus, not only does the Clause protect against successive prosecutions for the same offense, it also "protects against multiple punishments for the same offense." *Id.* (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)); *United States v. Dixon*, 509 U.S. 688, 696 (1993) (stating that the "Double Jeopardy Clause . . . applies both to successive punishments and to successive prosecutions for the same criminal offense"). The ban against multiplicity in an indictment derives from this prohibition against multiple punishments. *See Chacko*, 169 F.3d at 145 ("An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed. This violates the Double

decision on the merits. Our conclusion as to Gioeli's *Brady* claim, however, renders both issues moot.

Gioeli was convicted of one count of racketeering conspiracy, which requires, *inter alia*, proof of participation in a "pattern of racketeering activity." 18 U.S.C. § 1962(c). To establish such a pattern, the government must prove "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). As previously explained, the jury found the government had proven Gioeli's involvement in three racketeering acts. Given our holding that the government's untimely disclosure of materials pertaining to Racketeering Act 2A (conspiracy to murder Minerva) does not invalidate or otherwise impinge upon the jury's finding regarding that Act, Gioeli's conviction for racketeering conspiracy would be supported by two predicate acts (Racketeering Acts 2A and 5A) even if we were to rule in Gioeli's favor on waiver and on the merits and strike Racketeering Act 3. Gioeli's multiplicity argument is thus moot, and we decline to address it.

---

Jeopardy Clause of the Fifth Amendment, <u>subjecting a person to punishment for the same crime more than once</u>." (emphasis added) (internal citations and footnote omitted)).

    Because multiple punishments are the constitutional harm to be avoided by the prohibition against multiplicitous indictments, it follows that in order for double jeopardy focused on resulting punishments to be implicated, the multiplicity must occur in a fashion that gives rise to the possibility of multiple punishments. In other words, the alleged multiple offenses must have been "charged" between or among "separate counts." Where, as here, the alleged multiplicity appears not in separate counts that each carry the possibility of conviction and punishment but in separate racketeering predicate acts that are components of a single overall count of racketeering conspiracy, the danger posed is an improper conviction based on legally insufficient evidence (*i.e.*, one that is not supported by proof of at least two predicate acts). But there is no danger of multiple punishments when charged with a single count of conspiracy. While legally insufficient proof of the elements of conspiracy is a cognizable basis for challenging a conviction, it is not the variety of harm addressed by the Double Jeopardy Clause.

13

### III.    Suppression of Evidence Removed from the Gioelis' Home

Prior to trial, Gioeli moved to suppress evidence taken from his home by Andrea Calabro, the wife of Dino Calabro, and also by the FBI during a search conducted pursuant to a search warrant. The district court held a suppression hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), and filed a memorandum decision denying the motion. Gioeli challenges that decision.

The pertinent facts regarding Gioeli's suppression arguments are as follows.[7] Gioeli and Dino Calabro, along with their wives Maureen Gioeli and Andrea Calabro, were neighbors and friends for almost 20 years. At the time of the events at issue, Calabro and Gioeli had both been charged under the S-4 indictment with crimes for which both men were eligible to receive the death penalty. From 2008 to 2010 the Department of Justice conducted a review to determine if the government would pursue that penalty.

In 2009, Dino Calabro began actively pursuing a cooperation agreement with the government. To assist in the effort, Mrs. Calabro provided FBI Special Agent Scott Curtis various family mementos including photographs that she indicated were given to her by Mrs. Gioeli. Mrs. Calabro informed Agent Curtis that Mrs. Gioeli often took photos at family events and social gatherings, had done so for a number of years, and had invited the Calabro family to look through and borrow photos that might support Mr. Calabro's death penalty

---

[7]    We draw heavily from the district court's findings of fact based on evidence and testimony proffered at the *Franks* hearing. Gioeli does not appear to challenge the court's factual findings on appeal, and in any event, after thorough review of the record in this case we conclude that those findings are well-supported by the evidence and are not clearly erroneous. *See United States v. Bershchansky*, 788 F.3d 102, 108 (2d Cir. 2015) (reviewing district court's findings of fact on a motion to suppress evidence for clear error).

review submission. At Agent Curtis's suggestion, Mrs. Calabro accepted the invitation, arranging with Mrs. Gioeli to borrow photos for the death penalty mitigation process. After Mrs. Gioeli provided Mrs. Calabro with a number of photos, Mrs. Calabro asked if she could come to the Gioelis' home to search Mrs. Gioeli's photo collection herself. Mrs. Gioeli agreed, and on several occasions the two women spent time looking through numerous photo albums in the Gioelis' home. Mrs. Gioeli gave Mrs. Calabro permission to borrow any photos of the Calabro family that might benefit Mr. Calabro's death penalty review submission. In April 2009, when Mrs. Gioeli was momentarily absent, Mrs. Calabro took an address book from the Gioelis' home. She then turned it over to Agent Curtis along with several pictures that Mrs. Gioeli later claimed she had not given Mrs. Calabro permission to borrow. Agent Curtis did not instruct Mrs. Calabro one way or the other whether she should take anything from the Gioelis' home without Mrs. Gioeli's permission. Agent Curtis did, however, open and examine the contents of the address book despite knowing that Mrs. Calabro did not have permission to take it from the Gioelis' home.

In January 2010, Agent Curtis applied for a warrant to search the Gioelis' home and to seize a wide variety of items located there. Agent Curtis's affidavit in support of the warrant relied heavily on information he learned from Mrs. Calabro, whom he identified as a confidential source. Agent Curtis disclosed that Mrs. Calabro had removed an address book without Mrs. Gioeli's permission and handed it over to the FBI. The affidavit's discussion of the content of the address book is limited to the following statement: "The address book and its accompanying papers contain[] entries for, among others, 'Dino Andrea Calabro,'

15

'Michelle & Joey Compentillo,' 'Billy & Kathy Russo,' and 'Connie Chucky Russo,' all of which entries I believe refer to Colombo family members and their wives." J.A. 311. A magistrate judge issued the warrant, and the FBI seized a number of responsive items, including photo albums, address books, wallets containing business cards, and cell phones.

The Fourth Amendment enshrines "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The exclusionary rule is a judicially created mechanism that safeguards these Fourth Amendment rights, "generally through its deterrent effect," *United States v. Calandra*, 414 U.S. 338, 348 (1974), by forbidding "the use of improperly obtained evidence at trial," *United States v. Herring*, 555 U.S. 135, 139 (2009). When applicable, the exclusionary rule "reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (citation omitted) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

Not every Fourth Amendment violation warrants suppression. *See Illinois v. Gates*, 462 U.S. 213, 223 (1983) ("The question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct."). Exclusion is a "last resort, not [a] first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

16

"On appeal from a district court's ruling on a motion to suppress evidence, we review legal conclusions de novo and findings of fact for clear error." *United States v. Bershchansky*, 788 F.3d 102, 108 (2d Cir. 2015) (internal quotation marks omitted). We review the erroneous admission of evidence obtained in violation of a defendant's constitutional right for harmless error, affirming the judgment if we "conclude beyond a reasonable doubt that a rational jury would have rendered a verdict of guilty absent the alleged error." *United States v. Dhinsa*, 243 F.3d 635, 649 (2d Cir. 2001). A defendant in Gioeli's position, therefore, must surmount a series of hurdles: first establishing a constitutional violation, then demonstrating that the violation falls under the ambit of the exclusionary rule, and finally showing that the erroneously admitted evidence affected the outcome of the trial. This is a heavy burden, and one that Gioeli ultimately fails to sustain.

Of Gioeli's three arguments for suppression, two were rejected by the district court, and one is raised for the first time on appeal.

Gioeli first challenges the constitutionality of Mrs. Calabro's entry of his home and retention of any photos, regardless of Mrs. Gioeli's consent, because of the "ruse" Mrs. Calabro wanted the photos to save her husband from death row, was so coercive as to render Mrs. Gioeli's consent involuntary, and thus invalid. The district court considered this argument and concluded that "[t]here can be no serious question that Mrs. Gioeli voluntarily consented to the search of her home." J.A. 417.

Although warrantless searches and seizures in a home are presumptively unreasonable, "the warrant requirement is subject to certain exceptions," *Brigham City v.*

17

*Stuart*, 547 U.S. 398, 403 (2006), including "when the search is conducted pursuant to the consent of an authorized person," *United States v. Snype*, 441 F.3d 119, 130 (2d Cir. 2006). The government must show by a preponderance of the evidence that the consent was voluntary and not "coerced, by explicit or implicit means, by implied threat or covert force." *Id.* at 131 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973)). "We will not reverse a finding of voluntary consent except for clear error." *Id.* Additionally, although the Fourth Amendment does not protect against searches or seizures "effected by a private party on [her] own initiative," it does apply when a private party commits the intrusion while acting "as an instrument or agent of the Government." *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614 (1989).

It is undisputed that Mrs. Calabro was acting as an agent or instrument of the government when she sought photos of her family from Mrs. Gioeli and when she borrowed photos *with Mrs. Gioeli's permission.* On appeal, as below, Gioeli cites *United States v. Montes-Reyes*, 547 F. Supp. 2d. 281 (S.D.N.Y. 2008), in which consent was found to be involuntary when government agents concocted a story involving an abducted four year-old girl to gain access to the defendant's hotel room. Even if *Montes-Reyes* were binding, it would be distinguishable: the "consent" in that case was elicited by an immediate "threat" to the life or welfare of a child. Here, even if the prosecution sought the death penalty, it would come to pass only after lengthy and attenuated proceedings. The district court did not err, clearly or otherwise, in finding that Mrs. Gioeli voluntarily consented to Mrs. Calabro's

18

presence in the Gioelis' home for the purpose of viewing and borrowing photos of the Calabro family.

Mrs. Gioeli's consent, on the other hand, did not extend to some of the materials Mrs. Calabro took from the Gioelis' house, including the address book and, as asserted by Mrs. Gioeli, certain photos. These actions, Gioeli argues, were beyond the scope of his wife's consent and violated the Fourth Amendment because Mrs. Calabro was acting in her capacity as an agent of the government. This argument also fails. "A private person cannot act unilaterally as an agent or instrument of the state; there must be some degree of governmental knowledge and acquiescence," *United States v. Bennett*, 709 F.2d 803, 805 (2d Cir. 1983) (quoting *United States v. Sherwin*, 539 F.2d 1, 6 (9th Cir. 1976) (en banc)), in the actions that violate the Fourth Amendment. In this regard we will not disturb the district court's factual findings that Mrs. Calabro "acted in direct contravention of Special Agent Curtis's instructions to borrow photographs from Mrs. Gioeli" and that Agent Curtis had no reason to know that Mrs. Calabro would do so. J.A. 419. Gioeli asserts in his reply brief that the scope of Mrs. Calabro's agency must be expressly limited by the government in order for her actions to be "in direct contravention" of the government's instructions such that those actions fall outside the scope of her agency (*e.g.*, "Do not remove anything from the Gioelis' home without permission."). Although such an instruction was given in *Bennett*, that case does not stand for the proposition that such an instruction must be given in every instance in order to avoid creating a general agency relationship between the government and a private citizen assisting with a government investigation. Neither logic nor law counsels that

19

any action the government failed expressly to proscribe thereby falls within the ambit of that private citizen's agency. Mrs. Calabro exceeded the scope of her government agency; the government did not know of her intent to do so; and, as far as we can ascertain from the record, it had no reason to suspect that she might do anything more than borrow photographs with Mrs. Gioeli's permission.[8] The district court's determination that Mrs. Calabro acted in her personal capacity when she removed the address book and any photos other than those authorized by Mrs. Gioeli was not clearly erroneous. Her actions do not offend the Fourth Amendment.

In an argument not raised before the district court, Gioeli now asserts that Agent Curtis's search of the address book without a warrant was unconstitutional. He concludes that not only should the address book have been suppressed on that basis but that the additional address books seized from the Gioelis' home pursuant to the warrant should also be suppressed as fruits of the poisonous tree. The record supports Gioeli's position that Curtis's search of the address book was conduct not permitted either by a warrant or any Fourth Amendment exception. *See United States v. Knoll*, 16 F.3d 1313, 1319 (2d Cir. 1994) (stating that the district court "failed to draw a distinction" between a burglary committed by a private citizen, and a subsequent search of the materials that had been stolen). We decline to reach this constitutional question, however, because assuming *arguendo* that there was a

---

[8]     In fact, the circumstances at the time could very reasonably lead an officer to conclude that Mrs. Calabro would not take anything without permission. As the district court pointed out, "Mrs. Calabro was afraid that people in her neighborhood thought Mr. Calabro was cooperating with the Government and that [Agent Curtis] had advised Mrs. Calabro to keep up appearances. Obviously, Mrs. Calabro stealing photographs and an address book from Mrs. Gioeli would arouse suspicion, not minimize it." J.A. 419 n.3.

constitutional violation, the admission of evidence derived from any of the address books was harmless. The only non-cumulative trial evidence yielded was an entry pertaining to "O.J.," whose murder was purportedly the catalyst for Marasa's murder. The government contended that Gioeli had approved the Marasa murder based on the request of others in his crew and not on any personal desire of his own to exact retribution for O.J.'s death. Thus, any relationship between O.J. and Gioeli was not material to any fact in dispute at trial. This conclusion is reinforced under the plain error standard that governs our review because Gioeli failed to raise these arguments in the district court. *See* Fed. R. Crim. P. 52(b); *United States v. Marcus*, 560 U.S. 258, 262-66 (2010) (under plain error standard, we may act only if there is error, that is clear or obvious, that affects substantial rights, and that seriously affects the fairness, integrity, or public reputation of judicial proceedings). There was no error in the district court's ruling on this aspect of Gioeli's motion to suppress, let alone an error that is plain or rises to the level of affecting Gioeli's substantial rights.

## IV.    Saracino's Sentencing Arguments

At sentencing, the court found for purposes of § 3553(a) that Saracino was involved in the murders of Greaves, Dols, and Cutolo, of which he had been acquitted, as well as the murder of Scopo, for which he had never been charged. Saracino argues that the district court overstepped its authority and challenges the propriety of making these findings without a *Fatico* hearing. We conclude that the district court was entitled to rely on the trial evidence, forgo a *Fatico* hearing, and find these facts by a preponderance of the evidence.

21

We have often referred to the "largely unlimited" discretion of a sentencing court "either as to the kind of information it may consider, or the source from which it may come." *United States v. Gomez*, 580 F.3d 94, 105 (2d Cir. 2009) (quoting *United States v. Sisti*, 91 F.3d 305, 312 (2d Cir. 1996)). So broad is this discretion that a sentencing court "is entitled to rely on any type of information known to it," even information gleaned "from a trial in which [the] person to be sentenced was neither a defendant nor represented by counsel." *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993) (citing *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989)). Accordingly, "it is well established that a district court need not hold an evidentiary hearing to resolve sentencing disputes, as long as the defendant is afforded 'some opportunity to rebut the Government's allegations.'" *United States v. Broxmeyer*, 699 F.3d 265, 280 (2d Cir. 2012) (quoting *United States v. Phillips*, 431 F.3d 86, 93 (2d Cir. 2005)). We review the district court's factual findings at sentencing "for clear error, bearing in mind that the standard of proof at sentencing is a preponderance of the evidence." *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004) (citations omitted).

The district court was entitled to rely upon the trial evidence in finding the facts on which it sentenced Saracino. No *Fatico* hearing was required because Saracino already had an opportunity to rebut the government's allegations and to do so in a trial presided over by the sentencing judge. Witnesses testified regarding Saracino's personal involvement in the murders of Greaves, Dols, and Cutolo. As to the murder of Scopo, the district court found only that Scopo's murder was the result of the conspiracy that the jury found had been proven against Saracino. This finding is supported by trial testimony that Saracino and his

22

co-conspirators "took steps to look for" Scopo, and that one of the co-conspirators was later charged with Scopo's murder. The district court did not clearly err in finding these facts by a preponderance of the evidence. There is neither a legal nor logical inconsistency between acquittal by a jury (*i.e.*, a finding that a fact was not proved beyond a reasonable doubt) and a factual finding of guilt by a sentencing court (by a preponderance) based on the same evidence.

## V. Additional Arguments

Gioeli challenges the district court's denial of his motion for acquittal, or in the alternative, for a new trial based on the sufficiency of the evidence. On a defendant's post-verdict motion, the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The motion must be denied if, after viewing the evidence in the light most favorable to the prosecution, the court concludes that "any rational trier of fact could have found the essential elements of the crime established beyond a reasonable doubt." *United States v. Moore*, 54 F.3d 92, 100 (2d Cir. 1995). We review *de novo* a district court's denial of a motion for acquittal. *United States v. Pizzonia*, 577 F.3d 455, 462 (2d Cir. 2009). Under Rule 33(a) of the Federal Rules of Criminal Procedure, on a defendant's motion the court may vacate the judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). The standard applied is whether "it would be a manifest injustice to let the guilty verdict stand." *United States v. Lin Guang*, 511 F.3d 110, 119 (2d Cir. 2007) (citing *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). In order to grant the motion the reviewing court must "harbor 'a real

concern that an innocent person may have been convicted.'" *Id.* (quoting *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007)). Denial of a motion for a new trial is reviewed for abuse of discretion. *Id.*

Gioeli argues that all of the evidence supporting his conviction came from witnesses "who were entirely lacking in credibility." Appellant Gioeli's Br. 39. "Assessments of witness credibility and choices between competing inferences lie solely within the province of the jury." *United States v. Payne*, 591 F.3d 46, 60 (2d Cir. 2010). A court reviewing a post-trial motion may intrude only in "exceptional circumstances." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (citation omitted). We agree with the district court that Gioeli "had ample opportunity to present to the jury [his] claims about the lack of credibility of the Government's witnesses through cross-examination and closing arguments," J.A. 900, and that no "exceptional circumstances" warrant judicial review of the jury's determinations regarding the weight to be given and credibility of the witnesses' testimony.

Gioeli also argues that there is insufficient evidence to connect the conspiracy to murder Marasa to Gioeli or to the criminal enterprise. Gioeli focuses exclusively on the motive for Marasa's murder but ignores the fact that Calabro testified that Gioeli sanctioned and helped plan the murder. As the district court acknowledged, Gioeli presented some conflicting testimony, but again, the issue is one of weight and credibility. We agree with the district court that there was sufficient evidence to support the jury's finding that Gioeli conspired to murder Marasa. Additionally, we find no merit in Gioeli's contention that the Marasa murder conspiracy was unrelated to the criminal enterprise. Gioeli's participation in

the murder arose solely by virtue of his control over the affairs of the enterprise. *See United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006). There being no basis to find manifest injustice, we further conclude that the district court did not abuse its discretion in denying Gioeli's motion for a new trial on this basis.

Saracino challenges the district court's denial of his motion to sever his trial, or in the alternative to empanel a separate jury to determine his guilt. "[A] district court should grant a severance under [Federal Rule of Civil Procedure 14] only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). We will reverse a district court's denial of a motion for severance "only if a defendant can 'show prejudice so severe that his conviction constituted a miscarriage of justice and that the denial of his motion constituted an abuse of discretion.'" *United States v. Diaz*, 176 F.3d 52, 102 (2d Cir. 1999) (quoting *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993)). Saracino argues that he was subject to spillover prejudice from evidence introduced at trial pertaining to Gioeli's prior bad acts and propensity for violence that would not have been admissible if Saracino was standing trial alone. This argument is entirely too speculative and generalized, and it falls far short of demonstrating an abuse of discretion or a miscarriage of justice.

Finally, Gioeli argues that the government's conduct in this case was so outrageous as to warrant reversal. *See United States v. Bout*, 731 F.3d 233, 238 (2d Cir. 2013) (acknowledging the possibility that "outrageous government conduct could bar a criminal conviction," but

only if a defendant shows that the conduct "is so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction," or "shock[s] the conscience" (internal quotation marks omitted)). A defendant advancing a claim based on outrageous government conduct bears a "very heavy burden" that is rarely sustained, and generally only if the government was involved with the underlying criminal activity by means of "coercion or violation of the defendant's person." *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011) (internal quotation marks omitted). The government actions upon which Gioeli's claim is based pertain primarily to the prosecution and investigation of this case and certainly not to government involvement in any criminal conduct. Even setting aside this distinction, the government's actions here simply do not, individually or in the aggregate, rise to the level of outrageousness required for us to disrupt the judgment in this case, especially in light of the fact that we have rejected all of defendants' substantive arguments, including several that are directly related to that conduct.

We have considered the remaining variations of defendants' arguments and find them to be without merit.

## CONCLUSION

For the reasons detailed herein, the judgment of the district court is AFFIRMED.

26