18-1018-cr
*United States of America v. Oniel McKenzie*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————

August Term 2020

(Argued: April 7, 2021 | Decided: September 9, 2021)

Docket No. 18-1018

UNITED STATES OF AMERICA,

*Appellee*,

v.

ONIEL MCKENZIE, AKA DARRIN CLARK, AKA SHOWER

*Defendant-Appellant.*†

———————

Before:
      LIVINGSTON, *Chief Judge*, WESLEY, CARNEY, *Circuit Judges*.


      In October 2017, a jury convicted Oniel McKenzie of knowingly and intentionally possessing with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1). At trial, the Government introduced evidence showing that law enforcement officers recovered approximately 100 pounds of marijuana from a storage unit linked to McKenzie. McKenzie argues that the district court (D'Agostino, *J.*) should have suppressed this evidence because a warrantless dog sniff outside of the unit violated his Fourth Amendment rights. We hold that the dog sniff was not a search within the meaning of the Fourth Amendment.

---

† The Clerk of the Court is directed to amend the official caption as set forth above.

McKenzie also contends that the district court should have held an evidentiary hearing to address his claim that police investigators knowingly misled a New York court in an application for a search warrant. We disagree and hold that the district court was not required to conduct such a hearing. We have considered McKenzie's remaining arguments and find them to be without merit. We therefore **AFFIRM** the judgment of the district court.

———————————

ONIEL MCKENZIE, *pro se*, FCI Fort Dix, Joint Base MDL, NJ.

RAJIT S. DOSANJH, Assistant United States Attorney, *for* Antoinette T. Bacon, Acting United States Attorney for the Northern District of New York, Syracuse, NY, *for Appellee*.

BRIAN E. SPEARS (Janna D. Eastwood, *on the brief*), Spears Manning & Martini LLC, Southport, CT, *for Defendant-Appellant*.

———————————

WESLEY, *Circuit Judge*:

Oniel McKenzie was convicted of possessing marijuana and cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) following a jury trial in the United States District Court for the Northern District of New York. He was sentenced to a below-Guidelines term of 188 months' imprisonment and five years of supervised release. In a counseled brief, he argues that the district court wrongly denied his motion to suppress evidence, failed to hold a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), erroneously calculated his Guidelines sentencing range, and entered a judgment of conviction despite insufficient

2

evidence. In a *pro se* brief, McKenzie additionally argues that the district court erred by admitting testimony about uncharged drug offenses, relying at sentencing upon drug quantities destroyed by the Government, violating his right to a speedy trial, and exercising jurisdiction despite his crime not being a federal offense. Having considered these arguments, we find no reversible error in the decisions of the district court and affirm the judgment of conviction.

## BACKGROUND

### I. Facts[1]

On April 30, 2014, a federal grand jury indicted Oniel McKenzie on one count of possessing with an intent to distribute five or more kilograms of cocaine and 100 or more kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1). The indictment capped a months-long investigation by the Albany, New York office of the Drug Enforcement Administration ("DEA") into McKenzie's drug trafficking operation. A confidential informant originally identified McKenzie as the leader of an enterprise wherein two women (later identified as Deondra Forney and

---

[1] These facts are drawn from the Memorandum Decision and Order entered by U.S. District Court Judge Mae A. D'Agostino on November 4, 2015, the appendix filed by McKenzie with his counseled brief (hereinafter "A"), the pre-sentencing report ("PSR"), and relevant district court docket entries.

3

Latrina Riggins) picked up packages of cocaine and marijuana from UPS

mailboxes and transported them to storage units controlled by McKenzie in the

Albany area.

*The First Search*

DEA agents were able to confirm many of the confidential informant's

allegations through first-hand observation. In late September 2013, they began

conducting surveillance on Riggins. On October 3, an agent observed her pick up

eleven boxes from a UPS store in Troy, New York, and transport them to Mabey's

Self Storage ("Mabey's") in Rensselaer, New York. Agents interviewed the Site

Manager for Mabey's and reviewed surveillance footage showing Riggins

accessing storage units throughout the facility.

The storage units at Mabey's are enclosed by a fence and a security gate in

an open air area. When Riggins arrived at Mabey's, the agent continued his

surveillance within the enclosed area.[2] Riggins opened unit 296 ("Unit 296"),

placed several boxes inside, locked the door, and left at approximately 5:35 p.m.

When she departed, the agents called in a canine unit. The dog—certified in

---

[2] The record is not clear as to how the agent gained access to the enclosed area.

4

narcotics detection—examined the outside of several storage units and alerted on Unit 296.  In an interview with the Site Manager the next day, agents learned that Unit 296 was rented by "Darrin Clark."

New York State Police Investigator Christopher T. Gilroy prepared and signed an application for a warrant to search Unit 296.  His affidavit accompanying the application described the informant's tips, the surveillance operation, and the canine alert.  The Hon. Thomas A. Breslin of the Albany County Supreme Court signed the warrant that afternoon; law enforcement officers commenced a search of Unit 296 and ultimately seized approximately 100 pounds of marijuana.  The marijuana was packaged in cardboard boxes, white construction buckets, and trash bags.

*The Second Search*

Later that afternoon, Investigator Gilroy applied for a second warrant.  He indicated in his affidavit that officers were surveilling Unit 296 at approximately 12:10 p.m. when a Jeep entered Mabey's, its driver opened Unit 296, paid rent at the front office, and then drove away.  The officers followed the Jeep to 27 Thornton Street, where it parked and the driver exited and began talking with a man on the sidewalk.  At the request of a DEA agent, the officers approached the

driver and asked for identification. The driver, later identified in court as McKenzie, presented a California driver's license in the name of Darrin Clark—the name registered to Unit 296. Following this brief interaction with the officers, McKenzie dropped the Jeep's keys into the open engine block compartment of a nearby truck and walked away. He left the scene in a different vehicle.

The police then called a canine unit which alerted for drugs within the Jeep. Investigator Gilroy stated in his affidavit that six cardboard boxes similar to the ones Riggins placed in Unit 296 were plainly visible in the Jeep. He also referenced the marijuana recovered from Unit 296. Justice Breslin signed the warrant to search the Jeep at 3:54 p.m. An initial search revealed approximately fifty-six kilograms of marijuana. A handgun, ammunition, and $68,780 in cash were later discovered in a "sophisticated trap" in the back of the vehicle. PSR ¶ 17.

McKenzie contends that the officers searched the Jeep before Justice Breslin issued the warrant. He relies upon the affidavit of Paul Breslin, a mechanic who claimed to have witnessed the search.[3] In Breslin's account, "[t]he police . . . stated the vehicle was unlocked and opened the doors to the jeep at approximately 11:00

---

[3] Paul Breslin is the nephew of Justice Thomas Breslin, who issued the warrants.

a.m." A 72. He claimed the Jeep was parked on Thornton Street from "approximately 10:00 a.m.," contradicting Investigator Gilroy's account of the officers seeing it at Mabey's that afternoon. *Id*. Breslin stated he was "certain the police searched the vehicle before the warrant arrived" because he "watched them do so" and "heard when they stated they had the warrant which was much later then [sic] when they first opened the doors." A 72–73.

The Government responded with two sworn affidavits. Investigator Gilroy acknowledged in his affidavit that he was not present on the scene, but asserted that he had "spoken to members of the Drug Enforcement Administration who were present, and learned that there was no search [of the Jeep] prior to the time of the issuance of the warrant." A 121. DEA Special Agent Ronald Arp stated in his affidavit that he was "personally present and maintaining surveillance of the Jeep from the time it was parked by an individual later identified as Oniel McKenzie until the time that the search was conducted pursuant to a warrant issued by Justice Breslin at 3:54 pm . . . ." A 129. He asserted that "[a]t no point during this interval was the Jeep opened or searched." *Id*.

*The Third Search*

Later that day, Investigator Gilroy applied for a search warrant for an apartment located at 6707 Oak Hill Circle (the "Oak Hill Residence") in nearby North Greenbush, New York. According to the application, records obtained from the landlord showed that the Oak Hill Residence was rented in the names of Chantell Chambers and Darrin Clark. A Jeep of the same model and year as the one from which the marijuana had been recovered on Thornton Street was registered to the apartment. The application also noted the marijuana recovered from Unit 296 as a predicate for probable cause. Justice Breslin issued the warrant.

Upon execution of that search warrant, law enforcement officers seized approximately 60 kilograms of cocaine from the Oak Hill Residence. The cocaine was packaged in a manner similar to the marijuana recovered from Unit 296—cardboard boxes, white construction buckets, garbage bags, and packing peanuts. DEA Special Agent James Cryan testified that the agents also found a booklet containing names, quantities, and dollar amounts—i.e., what appeared to be a drug ledger—in the Oak Hill Residence. Fingerprints recovered from the scene matched McKenzie's, according to expert testimony introduced at trial.

8

## II. Procedural History

McKenzie was charged with knowing and intentional possession of cocaine and marijuana with an intent to distribute in violation of 21 U.S.C. § 841(a)(1), (b)(1)(a). McKenzie's counsel moved to suppress the evidence acquired during the searches and requested a hearing to challenge the warrant applications under *Franks*. The district court denied the motion, ruling that the dog sniff outside of Unit 296 was not a search within the meaning of the Fourth Amendment. It made two alternative holdings on the search of the Jeep: (1) that McKenzie lacked standing to challenge the search of the Jeep because he abandoned any expectation of privacy by discarding the keys, and (2) even assuming the Jeep was searched prior to the issuance of the warrant, the inevitable discovery rule made the evidence recovered from it admissible. Based upon the validity of the warrants to search Unit 296 and the Jeep, the district court found that the Oak Hill Residence warrant was "undoubtedly supported by probable cause." A 154. It also rejected McKenzie's request for a *Franks* hearing.

In a motion *in limine*, the Government sought to admit evidence of McKenzie's prior drug trafficking activity under Federal Rule of Evidence 404(b), arguing that it would establish his connection to accomplices and knowledge of

9

wrongdoing. McKenzie objected, contending that the evidence would impermissibly connect him to uncharged offenses. The district court denied the Government's request without prejudice to renew at trial and ultimately admitted some of the testimony.

Forney testified that she opened a post office box for McKenzie in January 2013, picked up packages for him, and that McKenzie once showed her a package containing marijuana. Chambers testified that she knew McKenzie for a year prior to his arrest, knew that he was a drug dealer, and rented an apartment for him. Riggins testified that in September and October 2013 she picked up packages and delivered them to the storage facility. The district court instructed the jury not to consider this testimony as proof that McKenzie had committed the acts charged in the indictment, but rather only as proof that he had acted knowingly.[4]

The jury found McKenzie guilty of possessing the controlled substances with an intent to distribute. It further found that the offenses involved at least five kilograms of cocaine and at least 100 kilograms of marijuana. The PSR calculated a base offense level of thirty-four under the Guidelines and recommended a term

---

[4] In July 2017, the district court granted McKenzie's request to proceed pro se. He represented himself from that point forward, including through the trial.

of imprisonment of 292 to 365 months.  McKenzie objected, arguing that fifty of the sixty kilograms had been destroyed.  The district court rejected this argument, noting that the Government had presented evidence regarding the total amount of drugs recovered and followed its usual practice of destroying excess quantities.  The district court adopted the PSR's Guidelines calculation but imposed a below-Guidelines sentence of 188 months' imprisonment.

## DISCUSSION

### I. The District Court Did Not Err in Denying McKenzie's Motion to Suppress

On appeal from a motion to suppress, we review a district court's conclusions of law *de novo* and its conclusions of fact for clear error.  *United States v. Alexander*, 888 F.3d 628, 631 (2d Cir. 2018).  Factual determinations about use, privacy, and the physical characteristics of a property are reviewed for clear error.  *Id*.  "Whether the untainted portions [of a warrant application] suffice to support a probable cause finding is a legal question" that is reviewed *de novo*.  *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000).  A district court's error in deciding a motion to suppress is further reviewed for harmlessness.  *United States v. Cacace*, 796 F.3d 176, 188 (2d Cir. 2015) (per curiam).

11

## A.    Applicable Law

The Supreme Court has articulated two tests to determine when a search

occurs within the meaning of the Fourth Amendment. [5]  The first, the 'property

rights baseline' test, recognizes a search when the Government obtains

information by physically intruding on persons, houses, papers, or effects.  *Florida*

*v. Jardines,* 569 U.S. 1, 5 (2013).  This language tracks the categories listed in the

---

[5] The Fourth Amendment does two things: (1) it prohibits unreasonable searches and seizures and (2) it specifies the conditions under which a warrant can be issued.  *See* U.S. CONST. amend. IV; *Mendez v. Cty. of L.A.*, 897 F.3d 1067, 1075 (9th Cir. 2018).  It does not, however, proscribe the use of unconstitutionally obtained evidence against a criminal defendant at trial.  *See United States v. Hightower*, 950 F.3d 33, 36 (2d Cir. 2020) (per curiam).  Until the 20th century, unconstitutional searches and seizures were remedied through civil suits against the trespassing officers.  *See Utah v. Strieff*, 136 S. Ct. 2056, 2060– 61 (2016).

Courts have since developed the 'exclusionary rule'—which requires trial courts to exclude unlawfully seized evidence from criminal trials—as the "principal judicial remedy to deter Fourth Amendment violations."  *See id*. at 2061 (citing *Mapp v. Ohio*, 367 U. S. 643, 655 (1961)).  The rule encompasses both the "primary evidence obtained as a direct result of an illegal search or seizure" and secondary "evidence later discovered and found to be derivative of an illegality."  *Id*. (citing *Segura v. United States*, 468 U. S. 796, 804 (1984) (internal quotation marks omitted)).

"To be sure, the Supreme Court has declined to apply the exclusionary rule where evidence is obtained as a result of simply negligent, as opposed to "deliberate, reckless, or grossly negligent conduct," *Herring v. United States*, 555 U.S. 135, 144 (2009), or where evidence is obtained from a search conducted in "reasonable reliance" on binding precedent, *see Davis v. United States*, 564 U.S. 229, 241 (2011); *see also Hudson v. Michigan*, 547 U.S. 586, 591–96 (2006) (recognizing the exclusionary rule as a "last resort" means of upholding the Fourth Amendment and holding it inapplicable in knock-and-announce cases).  Here, the parties do not dispute that if a Fourth Amendment violation occurred here, suppression would have been appropriate.

Fourth Amendment. *See* U.S. CONST. amend. IV. One advantage of this test is that it "keeps easy cases easy" through a bright-line rule of general application. *Jardines,* 569 U.S. at 11.

The second test protects a more nuanced realm of interests. It forbids warrantless searches that violate a person's reasonable expectation of privacy. *See Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, *J.,* concurring). Courts employ a two-part inquiry to assess the legitimacy of a privacy expectation: "first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *California v. Ciraolo*, 476 U.S. 207, 211 (1986). Searches conducted pursuant to a defendant's consent, observations of items in plain view (or plain hearing, smell, or feel), and recoveries of abandoned property are not protected by the Fourth Amendment under this test. *See United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018); *United States v. Gori*, 230 F.3d 44, 50 (2d Cir. 2000); *United States v. Levasseur*, 816 F.2d 37, 44 (2d Cir. 1987).

A canine sniff outside a residence can be considered a search within the meaning of the Fourth Amendment under both tests. For example, in *Jardines* the Court found that the canine sniff performed *on the curtilage* of the defendant's

13

freestanding home was a physical intrusion on a protected property interest under the baseline test.[6] 569 U.S. at 4–6. The location of the dog was determinative, not the particular method (the dog's sensitivity to a substance's odor) of the search. *See id*. But Unit 296 is not a home. While the Fourth Amendment applies to businesses and offices (and storage units), *see See v. City of Seattle*, 387 U.S. 541, 543 (1967), the Court has not extended the concept of curtilage and its Fourth Amendment protections to commercial property. *See Dow Chemical Company v. United States*, 476 U.S. 227, 236, 239 (1986) (finding that open areas of a large industrial plant complex were not analogous to the curtilage of a dwelling for purposes of aerial surveillance). In *United States v. Dunn*, the Court identified the "centrally relevant consideration" for "extent-of-curtilage questions" as "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." 480 U.S. 294, 301 (1987). When one rents a storage unit, no curtilage comes with it.

---

[6] Curtilage is the area "immediately surrounding and associated with home" and is considered "part of [the] home itself for Fourth Amendment purposes." *Oliver v. United States*, 466 U.S. 170, 180 (1984).

We have held that a canine sniff can also be a search under the reasonable expectation of privacy test. In *United States v. Thomas* we determined that a dog sniff outside a closed apartment door violated the defendant's reasonable expectation of privacy. 757 F.2d 1359, 1367 (2d Cir. 1985). Our analysis in *Thomas* turned on the heightened expectation of privacy **in the home** as opposed to other settings. *Id*. at 1366–67. We found that "the defendant had a legitimate expectation that the contents of his closed apartment would remain private, that they could not be 'sensed' from outside his door" and concluded that the "[u]se of the trained dog impermissibly intruded on that legitimate expectation." *Id*. In the thirty-six years since *Thomas*, our expectation of privacy analysis in this context has fallen out of favor with our sister circuit courts. *See*, *e.g.*, *United States v. Lingenfelter*, 997 F.2d 632, 638 (9th Cir. 1993) (criticizing *Thomas*); *United States v. Colyer*, 878 F.2d 469, 475 (D.C. Cir. 1989) (same); *United States v. Reed*, 141 F.3d 644, 649–50 (6th Cir. 1998) (same). Despite unfavorable reviews, *Thomas* has never been overruled and remains binding on this panel. *See United States v. Hayes*, 551 F.3d 138, 142 (2d Cir. 2008) (affirming the validity of *Thomas* but declining to extend it to an area "65 feet behind the back door of the home").

15

## B. Unit 296

Whether the area outside a commercial storage unit enjoys the protections of the Fourth Amendment is an issue of first impression in this Circuit. Nevertheless, a clear answer emerges upon consideration of applicable Supreme Court precedent: the canine sniff outside the closed door of Unit 296 did not violate McKenzie's constitutional rights because it was not a search within the meaning of the Fourth Amendment.

McKenzie argues that the canine alert outside Unit 296 constituted a search under both the property rights baseline and reasonable expectation of privacy tests. He avoids a curtilage argument by correctly noting that the baseline analysis is not limited to houses but also extends to "effects" and commercial property. Appellant's Counseled Br. at 25 (citing *United States v. Jones*, 565 U.S. 400, 410–11 (2012); *United States v. Rahman*, 805 F.3d 822, 831 (7th Cir. 2015)). His argument focuses on the officers' entry into the enclosed area of Mabey's, since there was no pre-warrant incursion into Unit 296 itself. He insists that "[a]bsent any justification for how the officers accessed the gate," the District Court erred in its

determination that his property interests were confined solely to Unit 296.[7] Appellant's Counseled Br. at 24.

McKenzie's argument has two problems. First, he has not shown that the officers violated anyone's property rights when they entered the Mabey's facility. The record indicates that Mabey's management cooperated with the investigation: Investigator Gilroy stated that officers interviewed Mabey's Site Manager, reviewed its surveillance footage, and accessed its rental records. A 45–46. The district court could have inferred, without approaching clear error, that Mabey's management provided the officers access to the front gate. The burden to show a Fourth Amendment violation rests with the defendant. *See, e.g.*, *United States v. Quashie*, 162 F. Supp. 3d 135, 139 (E.D.N.Y. 2016). McKenzie offers no evidence suggesting that the officers trespassed onto the property.

Second, even if McKenzie had offered such evidence, the objection belongs to Mabey's. McKenzie had no authority to exclude people from Mabey's grounds.

---

[7] McKenzie points out that the district court erroneously described the storage facility as "unenclosed" and "generally open to the public." *See United States v. McKenzie*, No. 1:14-CR-169, 2015 WL 13840885, *6, *8 (N.D.N.Y. 2015). The Government acknowledges that a "security gate key pad" regulates access to the area where the units are located. Appellee's Br. at 15. While these descriptions constitute clear error on the part of the district court, the error was harmless. *See Alexander*, 888 F.3d at 631; *Cacace*, 796 F.3d at 188.

He only rented storage units *within* the facility. Because the officers did not infringe on McKenzie's interests by entering Mabey's, and did not physically intrude on Unit 296 prior to obtaining a warrant, McKenzie's objection under the baseline property rights test comes up short. *See United States v. Boden*, 854 F.2d 983, 990 (7th Cir. 1988) (law enforcement agents' initial warrantless entry into the commercial storage facility did not implicate the Fourth Amendment rights of the defendant, who had rented a unit in the facility); *Rakas*, 439 U.S. at 138 ("[T]he rights assured by the Fourth Amendment are personal rights").

McKenzie's objection fares no better under the reasonable expectation of privacy test. It is true that defendants generally enjoy a reasonable expectation of privacy in the internal spaces of storage units and commercial lockers. In *United States v. Karo*, for example, the Supreme Court considered the case of several defendants who had purchased drums of ether from a government informant. 468 U.S. 705, 708–10 (1984). The informant consented to the installation of a location-sensing 'beeper' in one of the drums before delivering them to the defendants. *Id*. at 709. The DEA used the beeper to locate the ether in a commercial storage facility, but its signal was not precise enough to reveal which storage unit contained the ether. *Id*. at 720. While traversing generally accessible parts of the

18

facility, the agents identified the smell of ether coming from a specific unit (they did not use a dog). *Id*. at 720–21. The Court held that this did not constitute a search within the meaning of the Fourth Amendment, but noted that "[h]ad the monitoring disclosed the presence of the container within a particular locker the result would be otherwise, for surely [the defendants] had a reasonable expectation of privacy in their own storage locker." *Id*. at 720 n. 6.

Even accepting that McKenzie had a reasonable expectation of privacy in the *internal* area of Unit 296, he did not have a reasonable expectation of privacy in the air *outside* of Unit 296. *United States v. Karo* is again instructive: the Court indicated that the police had not transgressed the defendants' "reasonable expectation of privacy in their own storage locker" by using their sense of smell to identify an odor present outside the unit and thus to identify which unit contained the contraband. 468 U.S. at 720–21.[8]

The officers' use of a canine in McKenzie's case is no different. In *Iverson* we noted that "as long as the observing person or the sniffing canine *are legally present* at their vantage [points] when their respective senses are aroused by obviously

---

[8] Similarly, a person smoking marijuana in their apartment could not reasonably expect that activity to be private if the odor carries through an open window onto the street.

incriminating evidence, a search within the meaning of the Fourth Amendment has not occurred." *See* 897 F.3d at 461 (quoting *Reed*, 141 F.3d at 649) (emphasis added). This standard, taken at face value, could be seen as conflicting with our holding in *Thomas* that a canine unit's alert while legally positioned outside a closed apartment door constitutes a search under the Fourth Amendment. *See* 757 F.2d at 1367. However, it is consistent with our own precedent where a defendant has granted the officers consent to be at their vantage point near or within a home (as was the case in *Iverson*).

We also find the *Iverson* standard well-adapted to canine sniffs of non-residential properties, as in McKenzie's case. The canine here was legally positioned outside Unit 296, in an area accessible to Mabey's employees and anyone renting one of the hundreds of units in the facility. Under these circumstances, the canine sniff outside Unit 296 did not violate McKenzie's reasonable expectation of privacy.

We are confident that this is the correct result under Supreme Court precedent, even despite our holding in *Thomas*. We acknowledge that today's decision and *Thomas* may be in tension. Both concern a space in which the defendant enjoyed a reasonable expectation of privacy (Unit 296 here, the

20

apartment in *Thomas*). Both involve a canine alert for drugs outside the closed door of that space in an area open to others. Yet, the two cases reach divergent outcomes on whether the sniff violated the defendant's reasonable expectation of privacy.

The crucial difference between the two cases is in the nature of the space. Our holding in *Thomas* rested upon the "heightened privacy interest that an individual has in his dwelling place." *See* 757 F.2d at 1366. We repeatedly emphasized that "a practice that is not intrusive in a public [setting] may be intrusive when employed at a person's home." *Id*. That different degrees of privacy interests attach to different settings is well-established in Fourth Amendment jurisprudence. *See*, *e.g.*, *New York v. Burger*, 482 U.S. 691, 700 (1987) ("An expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home."). The expectation of privacy reaches its zenith in the home. Observing officers' "significant enhancement" of their natural senses "accomplished by a different, and far superior, sensory instrument" cannot overcome the unique protections of the home in Fourth Amendment jurisprudence. *Thomas*, 757 F.2d at 1367; *see also United States v. Taborda*, 635 F.2d 131, 139 (2d Cir. 1980) (holding that officers'

21

warrantless use of a telescope to observe objects and activities within a home violated the Fourth Amendment); *Kyllo v. United States*, 533 U.S. 27, 40 (2001) (finding that use of a thermal-imaging device aimed a private home constituted a search within the meaning of the Fourth Amendment). But courts have declined to extend those same protections against enhanced sensory instruments to non-residential properties. *See, e.g.*, *United States v. Johnson*, 42 F. App'x 959, 962 (9th Cir. 2002) (mem.) (holding that a warrantless thermal imaging search of a barn was not an illegal warrantless search because "*Kyllo* applies only to a home").

Commercial storage units are closer to luggage in an airport, *see United States v. Place*, 462 U.S. 696, 697 (1983), or an automobile detained during a traffic stop, *see Illinois v. Caballes*, 543 U.S. 405, 409 (2005), than a dwelling. They do not present the privacy interests associated with the "intimate details" of one's life which are inherently associated with the home. *See Kyllo*, 533 U.S. at 37. We agree with our sister circuits and district courts in this Circuit that dog sniffs outside of storage units do not violate the renter's reasonable expectation of privacy. *See, e.g.*, *United States v. Cook*, 904 F.2d 37 (6th Cir. 1990) (unpublished); *United States v. Mikelic*, No. 10 Cr. 132 (CFD), 2011 WL 4368565, *5 n.13 (D. Conn. Sept. 19, 2011) (declining to extend *Thomas* to a canine sniff of a commercial storage unit).

22

### C.     The Jeep and Oak Hill Residence

McKenzie argues that the warrants approving the searches of the Jeep and the Oak Hill Residence were predicated on an unconstitutional canine sniff of Unit 296. Consequently, he insists, the evidence seized pursuant to those warrants should have been suppressed. However, since the canine sniff of Unit 296 was constitutional, the district court's decision to admit the evidence seized from the Jeep and the Oak Hill Residence was not in error.

## II.     The District Court Did Not Err in Denying McKenzie's Request for a Suppression Hearing

### A.     Applicable Law

A *Franks* hearing permits a criminal defendant to challenge the veracity of a warrant affidavit under certain circumstances. To trigger the hearing, a defendant must make a "substantial preliminary showing" that (1) the warrant application contains a false statement, (2) the false statement was included intentionally or recklessly, and (3) the false statement was necessary to the finding of probable cause. *Franks*, 438 U.S. at 155–56; *see also Levasseur*, 816 F.2d at 43. The Supreme Court has interpreted the warrant clause as containing an implicit guarantee that the information in a warrant application is "'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true."

23

*Franks*, 438 U.S. at 165. The fruits of the search must be excluded if the allegation of perjury or recklessness is established by a preponderance of the evidence and the affidavit's remaining content with the falsehoods set aside is insufficient to establish probable cause. *Id*. at 156.

Probable cause requires a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). When the available facts would "warrant a person of reasonable caution" to believe that contraband or evidence of a crime is present, an officer has probable cause to conduct a search. *Florida v. Harris*, 568 U.S. 237, 243 (2013). The Supreme Court instructs us to consider the "totality of the circumstances" in making probable cause assessments, and has rejected "rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach." *Id*. at 244.

In *Florida v. Harris*, the Court held that a canine alert may be sufficient to establish probable cause when a court is presented with "evidence of a dog's satisfactory performance in a certification or training program." *Id*. at 246. "If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court

24

should find probable cause." *Id.* at 248. However, if the defendant challenges the State's case, for example by disputing the reliability of the dog or the alert, then the court should weigh the competing evidence to determine whether a reasonably prudent person would have believed that contraband or evidence of a crime was present based upon the alert. *Id.*

There is mixed authority regarding the standard of review for denial of a *Franks* hearing in the Circuit. *See United States v. Papadakos*, 729 F. App'x 41, 44 n. 2 (2d Cir. 2018) (summary order). There is also a circuit split on the question. *See id.* However, a district court's conclusions of law are reviewed *de novo* and its conclusions of fact for clear error. *See United States v. Rajaratnam*, 719 F.3d 139, 153 (2d Cir. 2013) (citing *United States v. Moore*, 968 F.2d 216, 220–21 (2d Cir. 1992)). We review denial of a *Franks* hearing for clear error to the extent that it rests on factual findings. *United States v. One Parcel of Property Located at 15 Black Ledge*, 897 F.2d 97, 100 (2d Cir. 1990).

Whether an affiant acted with intent or recklessness is a factual question subject to the clearly erroneous standard. *Rajaratnam*, 717 F.3d at 153 (citing *United States v. Trzaska*, 111 F.3d 1019, 1028 (2d Cir. 1997)). Whether a false statement was material to the probable cause determination is a mixed question of law and fact

25

reviewed *de novo*. *Id*. (citing *United States v. Awadallah*, 349 F.3d 42, 65 (2d Cir. 2003)). That mixed standard is workable in this case, and we need not reconcile the conflicting authorities on this subject, since we find that denial was proper even under the more exacting *de novo* review.

### B. Analysis

McKenzie focuses his argument in support of a *Franks* hearing on the conflicting evidence surrounding the search of the Jeep. The affidavit from Paul Breslin contradicts Investigator Gilroy's warrant affidavit in two ways. First, Breslin claims to have seen the officers search the vehicle before they received the warrant. Second, his affidavit states that the Jeep was parked on Thornton Street from 10:00 a.m. to 4:00 p.m., contrary to the officers' account of observing the Jeep at Mabey's within that timeframe.

The district court correctly denied McKenzie's request for a *Franks* hearing because McKenzie failed to call into question the facts material to the legitimacy of the warrant. *See Franks*, 438 U.S. at 155–56. Breslin's affidavit fails to contradict the warrant application's assertion that the canine "gave a positive alert for the presence of a narcotic and/or marijuana." A 59. In his affidavit supporting the warrant application, Investigator Gilroy attested that the canine was "trained in

26

the detection of narcotics and/or marijuana." *Id*. The description of the dog's training is not detailed, but McKenzie has not challenged the reliability of the dog or the alert as to the Jeep. McKenzie did raise the issue of the dog's training with respect to the sniff of Unit 296, but "failed to submit any evidence that would call into question the reliability of the hits in this case." *McKenzie*, 2015 WL 13840885 at *13. The uncontested canine alert on the Jeep is sufficient to support a finding of probable cause.

Nor does McKenzie dispute the warrant application's assertion that officers observed six cardboard boxes "similar to the boxes that Latrina Riggins placed into Unit 296" the previous day in plain view inside the Jeep. *Id*. at *11. Considering the totality of the circumstances, a reasonably prudent person would understand the presence of these boxes to imply that they contained contraband. The police were acting on a tip from a confidential informant regarding a drug smuggling ring involving McKenzie. They observed Riggins pick up packages from a UPS store and deliver them to Unit 296, as anticipated by the informant. McKenzie then visited Unit 296, driving the Jeep, and was placed under surveillance. After he left, the police searched Unit 296 and recovered approximately 100 pounds of marijuana. The fact that boxes similar to the ones Riggins delivered to Unit 296

were in plain sight inside the Jeep supports a finding of probable cause under these circumstances. *See, e.g.*, *United States v. Clark*, 559 F.2d 420, 426 (5th Cir. 1977) (holding that probable cause existed to search a station wagon because police officers previously observed defendants loading similar burlap bags containing marijuana into another vehicle).

The Government's corroboration of the informant's allegations further supports a finding of probable cause and is not contradicted by the Breslin affidavit. When assessing the existence of probable cause based on an informant's information, "the core question . . . is whether the information is reliable." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993). In *Gates*, the Supreme Court found that police surveillance corroborating an informant's tip that a suspect would drive to Florida, that another suspect would fly into the state, and that the second suspect would drive the first suspect's vehicle back towards Illinois established probable cause to search the car. 462 U.S. at 244–45. "It is enough, for purposes of assessing probable cause, that '[corroboration] through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" *Id*. (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)); *see also Wagner*, 989 F.2d at 73.

28

The record here indicates that the informant's tip was reliable enough to establish probable cause to search the Jeep. Investigator Gilroy's warrant affidavit stated that the informant's information was "derived from their [sic] personal interaction with members of this criminal organization." A 56; *see Caldarola v. Calabrese*, 298 F.3d 156, 162–63 (2d Cir. 2002) (listing the "basis for the informant's knowledge" as one among several factors to consider in assessing the reliability of a tip). As discussed above, many of the informant's allegations were corroborated via the first-hand observations of law enforcement officers. The informant accurately predicted the participation of female couriers, the use of the storage unit, and the packaging of the narcotics. The corroboration here is even stronger than in *Gates*, given that the officers recovered contraband consistent with the informant's tip *before* searching the Jeep. *See Gates*, 462 U.S. at 244–45.

These three elements of the warrant application—the canine alert, the boxes in plain view, and the corroboration of the informant's allegations—independently support a finding of probable cause. Since these elements are uncontested, McKenzie cannot show that the warrant application would have

29

been denied but for the allegations contradicted by Breslin's affidavit.[9]  McKenzie

has not shown that the alleged misinformation was material.  *See Franks*, 438 U.S.

at 155–56.  The district court did not err by denying his request for a *Franks* hearing.

> **III.    The Government Presented Sufficient Evidence to Establish McKenzie's Knowing Possession of the Cocaine Found at the Oak Hill Residence Beyond a Reasonable Doubt.**

> **A.    Applicable Law**

We review *de novo* challenges to the sufficiency of the evidence on appeal.

*United States v. Hassan*, 578 F.3d 108, 122 (2d Cir. 2008).  We analyze the evidence

in the light most favorable to the Government, "crediting every inference that the

jury may have drawn in the government's favor." *Id*. (internal quotation marks

omitted). We remain mindful that "the government is entitled to prove its case

solely through circumstantial evidence."  *United States v. Coplan*, 703 F.3d 46, 69

(2d Cir. 2012) (internal quotation marks omitted).

---

[9] Indeed, because the officers had probable cause based on the undisputed facts, and because the discrepancies raised in Breslin's affidavit did not contradict these facts, a warrant was not actually required. *See United States v. Jones*, 893 F.3d 66, 71 (2d Cir. 2018); *United States v. Howard*, 489 F.3d 484, 494 (2d Cir. 2007) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." (citing *Pennsylvania v. Labron*, 518 U.S. 938 (1996) (alterations omitted))).

McKenzie was convicted of violating 21 U.S.C. § 841(a)(1) for unlawfully possessing cocaine and marijuana with an intent to distribute. To secure McKenzie's conviction with respect to the cocaine, the Government had to prove beyond a reasonable doubt that (1) he possessed the sixty kilograms of cocaine found in the Oak Hill Residence; (2) he possessed the cocaine with the intent to distribute; and (3) he did so knowingly. *See United States v. Gore*, 154 F.3d 34, 45 (2d Cir. 1998). "Possession with intent to distribute narcotics may be established by proof of the defendant's actual or constructive possession of the narcotics." *United States v. Snow*, 462 F.3d 55, 69 (2d Cir. 2006) (internal quotation marks omitted). Constructive possession requires that the defendant have the "power and intention" to exercise "dominion and control" over the narcotics, "either directly or through others." *United States v. Albarran*, 943 F.3d 106, 118 (2d Cir. 2019) (quoting *United States v. Facen*, 812 F.3d 280, 287 (2d Cir. 2016)). Dominion and control "need not be exclusive." *Snow*, 462 F.3d at 69.

B. Analysis

The Government presented sufficient evidence for the jury to conclude beyond a reasonable doubt that McKenzie was guilty of possessing the cocaine seized at the Oak Hill Residence with an intent to distribute. The evidence showed

that McKenzie controlled the Oak Hill Residence and the items within it. His former girlfriend, Chambers, testified that she rented the apartment at his direction for his use. She rented it in the name of Darrin Clark, the same alias McKenzie provided to police officers on Thornton Avenue and used to rent Unit 296. She further testified that McKenzie apologized for having ensnared her in his troubles and admitted to storing cocaine in the Oak Hill Residence. The similarities between the shipping and packaging of the contraband recovered from the Oak Hill Residence, the Jeep, and Unit 296 further indicate McKenzie's control over the cocaine in the apartment. In each case, the drugs were contained in white construction buckets, packaged inside cardboard boxes, and wrapped in white garbage bags. This evidence is sufficient to show beyond a reasonable doubt that McKenzie knowingly possessed the cocaine in the Oak Hill Residence. *See*, *e.g.*, *United States v. Teague*, 93 F.3d 81, 84 (2d Cir. 1996) (holding that evidence showing a defendant possessed and sold several bags of cocaine outside a building less than a week before identically packaged cocaine was recovered from within the building was sufficient to establish knowing possession).

## IV. The District Court Did Not Err in Calculating McKenzie's Guidelines Sentencing Range

### A. Applicable Law

The Sentencing Guidelines require district courts to apply a two-level increase to the base offense level for drug trafficking crimes "[i]f a dangerous weapon (including a firearm) was possessed." U.S.S.G. § 2D1.1(b)(1). "The enhancement should be applied if the weapon was present, unless it is *clearly improbable* that the weapon was connected with the offense." U.S.S.G. § 2D1.1(b)(1), Application Note 11(A) (emphasis added). The burden to make the "clearly improbable" showing rests with the defendant. *United States v. Smith*, 215 F.3d 237, 241 (2d Cir. 2000) (per curiam). "In order for a defendant's projected Guidelines sentence to be enhanced under § 2D1.1(b)(1), '[t]he defendant need not have had personal possession, or even actual knowledge of the weapon's presence; the enhancement is required so long as the possession of the firearm was reasonably foreseeable to the defendant.'" *United States v. Batista*, 684 F.3d 333, 343 (2d Cir. 2012) (quoting *United States v. Giraldo*, 80 F.3d 667, 677 (2d Cir.1996)).

"We review the District Court's factual findings at sentencing for clear error." *United States v. Stephens*, 369 F.3d 25, 27 (2d Cir. 2004) (per curiam). We review "*de novo* the application of the Guidelines to the facts." *Id*. The clear error

standard applies to McKenzie's claim that the district court erred by applying the two-level enhancement for possession of a firearm under Section 2D1.1(b)(1) of the Sentencing Guidelines.

### B. Analysis

McKenzie has not shown that the district court clearly erred by applying the two-level enhancement under Guidelines Section 2D1.1(B)(1). The firearm, ammunition, and $68,000 in cash were found in a "sophisticated trap" in the trunk area of the Jeep that McKenzie was operating. PSR ¶¶ 10, 17. McKenzie had long-standing control over the Jeep: he told police that he owned the Jeep, Chambers testified that she registered the car in her name at McKenzie's request and never drove it herself, and a confidential informant (whose other allegations were corroborated) claimed to have purchased and insured the Jeep for McKenzie. The Jeep was kept under constant surveillance by officers between the time that McKenzie drove it from Unit 296 and when the officers conducted their search—no one accessed the vehicle in the meantime to add the marijuana or the firearm. Fifty-six kilograms of marijuana were recovered from the Jeep, meaning that the gun was present in the vehicle while it was being used to transport narcotics.

Under these facts, it is not "clearly improbable" that the weapon was connected with McKenzie's drug trafficking activities. *See United States v. Pellegrini*, 929 F.2d 55, 56 (2d Cir. 1991) (per curiam). The Sentencing Guidelines provide an example of such an "improbable" circumstance: a defendant arrested in his residence with "an unloaded hunting rifle in the closet." U.S.S.G. § 2D1.1(b)(1), Application Note 11(A). McKenzie's case is a far cry from that example. To the contrary, it is *probable* that the gun was linked to McKenzie's drug trafficking activity, considering that it was recovered from the same compartment as approximately $68,000 in cash and from a vehicle transporting narcotics. McKenzie has not met his burden to overturn the sentencing enhancement.

* * * * *

We have considered McKenzie's other arguments raised in his *pro se* brief and find no error in the district court's decisions on those issues.

## CONCLUSION

We **AFFIRM** the district court's judgment of McKenzie's conviction.