**UNITED STATES of America, Appellee,**

v.

**Daniel OCAMPO, Theodoro Hernandez, Jose Otero, and Nicholas Munoz-Velasquez, Defendants-Appellants.**

Nos. 80–1326, 80–1332, 80–1334 and 80–1358.

United States Court of Appeals, Second Circuit.

Argued Feb. 2, 1981.

Decided June 2, 1981.

Barry E. Schulman, New York City (Edwin Ira Schulman, Enid Waxler McDonough, Schulman & Laifer, New York City, of counsel), for appellant Daniel Ocampo.

Paul E. Warburgh, Jr., New York City (Axelrod & Warburgh, New York City, of counsel), for appellant Theodoro Hernandez.

Edward S. Panzer, New York City, for appellant Jose Otero.

George L. Santangelo, New York City (Santangelo, Santangelo & Cohen, New York City, of counsel), for appellant Nicholas Munoz-Velasquez.

Thomas G. Roth, Asst. U.S. Atty. (Edward R. Korman, U.S. Atty., Eastern District of New York, Vivian Shevitz, Asst. U.S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before LUMBARD, MANSFIELD and MESKILL, Circuit Judges.

MANSFIELD, Circuit Judge:

Daniel Ocampo, Theodoro Hernandez, Jose Vincente Otero and Nicholas Munoz-Velasquez appeal from judgments of the Eastern District of New York entered after a jury trial before Judge John R. Bartels convicting them of conspiracy to distribute large quantities of cocaine in violation of 21 U.S.C. § 846. The trial was preceded by a four-week suppression hearing before Judge Bartels, following which he issued a comprehensive opinion upholding appellants' arrests, certain seizures of evidence from their automobiles at the time of their arrests, the search of an apartment believed to be a "stash pad" for cash, drugs, and drug paraphernalia, and the search of appellant Otero's home. 492 F.Supp. 1211 (E.D.N.Y.1980). We reverse the conviction of Hernandez and remand for a new trial. The other three convictions are affirmed.

Since appellants raise issues with respect to the denial of their motions to suppress as well as the trial itself, a review of the record of both proceedings becomes necessary.

*The Suppression Hearing*

The present case originated as the result of a Drug Enforcement Administration (DEA) investigation, supervised by Agent William Mockler, Jr., into a large organization engaged in Colombian cocaine-trafficking under the leadership of Jose Patino. Papers seized in 1978 from an associate, Heldar Puglarin, and in 1979 from Patino, led the DEA agents to the door of appellant Ocampo as a participant in cocaine sales. He lived at 1401 55th Street, Brooklyn, had been arrested in Colombia in 1971 for possession of cocaine, had been named by a government informer as a drug trafficker, and was shown by telephone pen register call records to be in communication with another known drug dealer (Ayerbe, also known as "Toby") listed in Patino's records.

On January 22, 1980, officers conducting a surveillance of Ocampo's apartment building at 1401 55th Street saw one Vasquez, also named in Patino's records, enter the apartment and emerge shortly with a yellow shopping bag which, upon Vasquez' arrest, was found to contain cocaine and $27,500 in cash. Pen register data revealed calls between Ocampo's phone and that of Vasquez.

On January 25, 1980, the agents conducted a second surveillance, this time of another apartment at 1440 Ocean Parkway in Brooklyn, which was leased to Ocampo and had a telephone registered to him. The apartment, not visibly occupied, had heavy curtains and an iron grating over its windows. Neighbors told the agents that the apartment seemed to be unoccupied but was regularly visited at night by well-dressed South Americans carrying cardboard boxes, one of whom seemed to fit Ocampo's description. Based on their extensive observation of the drug trade, the agents concluded that the apartment might be a "stash pad" used as a cache for the accouterments of the narcotics trade.

On January 28, when agents were once again observing the Ocean Parkway apartment, they saw Ocampo, who was carrying a brown paper bag and a leather shoulder bag, let himself into the apartment with a set of keys. After he left the apartment carrying only the shoulder bag, the agents followed him to his home at 1401 55th Street, and watched him place a cardboard box in the trunk of his car. He then proceeded to a Burger King restaurant in Brooklyn, parking in an open corner of the parking lot. He entered the restaurant and pretended to make a phone call while looking around nervously. A moment later, another car pulled into the lot next to Ocampo's car, and a man later identified as Hernandez emerged.

Hernandez entered the Burger King, but did not join Ocampo for several minutes. After talking together, the two men separated and left the restaurant. As they drove their cars out of the parking lot, one of the agents recognized Hernandez as a fugitive from the Immigration and Naturalization Service (INS). Hernandez had been handed over in October 1978 for deportation proceedings after being arrested on a narcotics charge and a warrant for his arrest was outstanding. The agent also thought Hernandez recognized him. The agents followed the two cars, which proceeded evasively, entering and leaving the expressway while both drivers constantly looked around to see if they were being followed. Finally, the agents pulled over both cars, and placed Ocampo and Hernandez and his passenger [1] under arrest.

Upon looking with a flashlight into the car driven by Hernandez, the agents saw on the rear seat floor two brown paper bags. One of the bags was open, and bundles of U.S. currency were in plain view. After removing the bags from the car, one of the agents felt the other bag and determined that it also contained bundles of currency. On the front seat of the auto driven by Ocampo was an unzipped blue and white flight bag,[2] which was the same as that carried by him out of the 1440 Ocean Parkway apartment. It contained a second unzipped bag, in which the agents found records evidencing a large volume of narcotics transactions.

On the next morning, January 29, at about 10:00 A.M., police, armed with a search warrant, entered Ocampo's "stash pad" on Ocean Parkway and seized cash, pistols, ammunition, a plastic bag of white powder later determined to be cocaine, and an additional receipt book. This book showed scheduled meetings at "MC" (McDonald's) and "BK" (Burger King). One meeting had been scheduled at "BK" between Ocampo and "Grone" ("Negro" with its syllables reversed) at the very time Ocampo and Hernandez appeared there prior to their being chased and arrested. Another "BK" meeting was scheduled with "Vic" (identified as appellant Jose Vincente Otero) on January 31 at 1:00 P.M.

At 12:57 P.M. on January 31, as agents watched, a car with two occupants pulled into the same part of the Burger King parking lot that Ocampo and Hernandez had used three days earlier. The man in the passenger seat got out and looked around nervously before returning to the car and speaking to the driver, whom agent Mockler recognized as resembling the Motor Vehicle Department's description of Otero. The two men briefly entered the Burger King, then returned with bags of food. The passenger once again left the car and began pacing back and forth, apparently waiting for someone, while the driver moved the car to a position offering a vantage point over the entire lot. After a few minutes more, the passenger returned to the car, and the two men began to drive out of the lot. As they reached the exit, agents drove their cars in front of and behind them, blocking their way.

1. Judge Bartels found the arrest of this passenger unsupported by probable cause, and charges against him were dropped.

2. They also seized the cardboard box and other evidence from the trunk of the Ocampo auto, but this evidence was suppressed by Judge Bartels and not introduced at trial.

Without drawing guns, the agents approached the car and asked the driver his name. When he said that he was Otero, they arrested him and his passenger, appellant Munoz.[3] Agent Mockler then reached into the back seat, where a paper bag that was taped shut at the top was partially covered by loose clothing. He did not open the bag at first, but felt its outside and concluded that the bag seemed to be full of wrapped currency. Inspection of the bag's contents confirmed his suspicions. The agents then searched the rest of the car, and found a loaded .45 caliber pistol under the passenger seat where Munoz had been sitting. A search of Munoz' clothes revealed that he had a .45 caliber bullet in his shirt pocket.

On that night Agent Mockler and two other agents went to Otero's house. After they told Otero's wife, Nora Otero, about her husband's arrest and calmed her down, she let them search the apartment and voluntarily signed a consent form that one of them translated into Spanish for her. (Mrs. Otero testified at the suppression hearing that they had intruded upon her, entered the apartment without permission when she opened the door to find out what they wanted, searched without her consent, and induced her to sign the consent form, which was in English and therefore unintelligible to her, by telling her that it was a receipt for articles seized.)

At the close of the suppression hearing Judge Bartels upheld the arrests of all four appellants, the seizures of the gun and the contents of Ocampo's flight bag and Hernandez' and Otero's paper bags, and the search of the "stash pad." He also found that Mrs. Otero had consented to the

agents' search of Otero's apartment, rejecting her contrary testimony as to the agents' behavior as incredible.

*The Trial*

The government's evidence at trial consisted generally of testimony recounting the arrests and offering the items seized in connection with those arrests and in the subsequent apartment searches. During the trial Agent Mockler testified over objection that he had learned from an unidentified "reliable informant" and from "some documents" which were also left unidentified that Hernandez was known as "Negro" Pabon.[4]

At the close of the evidence the defendants requested an instruction to the jury on the subject of its power to find multiple conspiracies, rather than a single conspiracy, from the evidence before it. Munoz also moved to have the charges against him dismissed on the ground that the evidence was insufficient to link him with the conspiracy. Both of these requests were denied. The jury found all four defendants guilty of conspiracy to distribute large quantities of cocaine.

## DISCUSSION

*Ocampo*

Ocampo attacks for lack of probable cause the DEA agents' initial warrantless arrest of him, their warrantless search of his unzipped bag within another open bag in the front seat of the car, and their search of the Ocean Parkway apartment leased to him. We find no merit in any of these claims.

---

**3.** There was some dispute as to the exact moment of Munoz' arrest, but we will assume, as the district court did at the suppression hearing, that he was arrested simultaneously with Otero.

**4.** The prosecution subsequently introduced the documents seized at Ocampo's "stash pad" at 1440 Ocean Parkway, Brooklyn, which showed a meeting scheduled with "Grone" at the place and time Hernandez and Ocampo met. But the documents to which Mockler was referring were never introduced into evidence at trial, i.

e., those seized from Jose Patino after his 1979 arrest, which showed, *inter alia*, a phone number linking "Negro" Pabon and Hernandez and a debit in "Negro" Pabon's name for attorneys' fees and bond forfeiture in the same amount ($6,000) and at the same time as Hernandez' legal fees and bond forfeiture in the deportation case before the immigration authorities. Indeed, these records would not have been admitted without at least being authenticated by Patino, from whom they had been seized.

The DEA agents arrested Ocampo only after observing a series of activities from which it could reasonably be inferred that he was engaged in sale of narcotics and possession with intent to distribute. After seeing Vasquez, with whom Ocampo had been in telephonic communication, enter the latter's apartment house and exit shortly thereafter with a bag containing cocaine and $27,500 in cash, the agents saw Ocampo enter and leave the apartment at 1440 Ocean Parkway laden with containers, then travel to the Burger King and orchestrate what was obviously a clandestine meeting with Hernandez. During this rendezvous he appeared to be nervous, made a fake phone call, pretended he and Hernandez were not together, then drove his car away from the Burger King in a manner calculated to elude surveillance. Further, because he answered the description of Ocampo and was observed at both Ocampo's 1401 55th Street home and at the Ocean Parkway apartment leased in the name of Ocampo, the police could reasonably conclude that he was the person whose name appeared as "Daniel" (Ocampo's first name) on the Patino and Pulgarin lists of fellow cocaine dealers, and whom Vasquez had met shortly before being arrested with the cocaine and large amount of cash on his person. In addition, the agents were aware that Ocampo had been arrested in Colombia for possession of cocaine. Though all of this evidence may not have been sufficient to convince a jury to convict Ocampo at the moment when they arrested him, it was sufficient to constitute probable cause for his arrest. See *United States v. Webb*, 623 F.2d 758, 761–62 (2d Cir. 1980).

Ocampo next attacks the warrantless search of his unzipped flight bags, which were lying on the front seat of his auto when he was arrested, on the ground that the search could not be justified under the "automobile exception" articulated in *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), which allows searches of automobiles and their contents pursuant to a lawful arrest, but was barred by the Supreme Court's later decisions in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); and by our decision in *United States v. Dien*, 609 F.2d 1038 (2d Cir. 1979). Those cases held that even where a suspect has been lawfully arrested in his motor vehicle the police may not without a warrant search parts of the car or containers in the car in which the owner has a reasonable expectation of privacy. That expectation must be an objective one, to be judged according to the nature of the container and the surrounding circumstances prior to the search. In *Chadwick*, the container whose contents were declared off-limits to a warrantless police search was a locked trunk; in *Sanders* it was an unlocked piece of luggage; and in *Dien* it was a sealed cardboard container located in a van with painted windows.

In *United States v. Mannino*, 635 F.2d 110 (2d Cir. 1980), after carefully considering these decisions relied on by Ocampo, we decided that not all containers possibly carrying personal effects are immune from a warrantless search pursuant to a lawful arrest of individuals in automobiles and declined to suppress evidence taken by police from a folded brown paper bag located inside a closed plastic bag. See also *United States v. Goshorn*, 628 F.2d 687 (1st Cir. 1980); *United States v. Macklin*, 626 F.2d 684, 687–88 (9th Cir. 1980). Here, though the bags were not made of plastic, Ocampo cannot have manifested objectively a reasonable expectation of privacy when they were concededly unzipped. Like the bags in *Mannino*, the open bags here also lack sufficient "fundamental character as a repository for personal, private effects," *id.* at 340, to come within the *Chadwick* rule. See *Robbins v. California*, 103 Cal.App.3d 34, 162 Cal.Rptr. 780 (1980); *cert. granted*, — U.S. —, 101 S.Ct. 1755, 68 L.Ed.2d 236 (1981); *Belton v. New York*, 50 N.Y.2d 447, 429 N.Y.S.2d 574, 407 N.E.2d 420 (Ct. App.1980), *cert. granted*, — U.S. —, 101 S.Ct. 917, 66 L.Ed.2d 838 (1981). Accordingly we affirm the admission of the evidence found inside these containers.

■ We need not pause long to consider the legitimacy of the search of the suspected "stash pad" apartment at Ocean Parkway. This search was conducted only after a warrant had been obtained, and followed surveillance of the apartment, interviews with neighbors, observation of Ocampo himself, and the arrest of Ocampo, the apartment's lessee, with evidence of narcotics activity in his car, all of which confirmed the apartment's appearance as a stash pad. Upon this record, which provided ample probable cause, the magistrate's issuance of the warrant was proper. Indeed he would have been derelict if he had not done so. The agents therefore did not violate Ocampo's rights in executing that warrant.

*Hernandez*

■ Hernandez claims that his arrest was without probable cause, that the seizure of the bag of cash in his back seat was illegal, and that Agent Mockler's testimony about his being known as Negro Pabon was inadmissible hearsay. The first two claims need not detain us long. Hernandez' suspicious actions with Ocampo, including the holding of their clandestine meeting and Hernandez' evasive driving when their cars left together, might themselves have sufficed to create probable cause to arrest him. Even if they did not, there is no dispute that one of the agents conducting surveillance, Robinson, recognized Hernandez as a bail-jumping fugitive from the Immigration and Naturalization Service. As soon as Hernandez was so recognized, there was probable cause to arrest him.

■ The paper bag seized from Hernandez' car by the agents was unsealed and sitting in open view in the back seat. As soon as the agent shined a flashlight on the bag, he saw currency sticking out of it. Since the bag was not closed or sealed, it lay outside the scope of *Chadwick* and within the general *Chambers v. Maroney* rule that evidence inside cars can be seized and examined without a warrant pursuant to a lawful arrest. See *United States v. Mannino, supra; United States v. Ochs,* 595 F.2d 1247, 1254–55 (2d Cir. 1979), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979), *rehearing denied,* 444 U.S. 1027, 100 S.Ct. 695, 62 L.Ed.2d 663 (1980). In addition, the agent's use of a flashlight did not keep the cash in the bag from being in "plain view" and therefore seizable under the logic of *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

■ Hernandez' third claim of error, that the trial court erred in admitting Agent Mockler's hearsay testimony that Hernandez was also known as "Negro" Pabon, stands on a different footing. Although a court, in conducting a hearing to determine the legality of a warrantless search or seizure, is not bound by strict rules of evidence, *United States v. Matlock,* 415 U.S. 164, 172–74, 94 S.Ct. 988, 993–95, 39 L.Ed.2d 242 (1974); Fed.R.Evid. 104(a), 1101(d)(1), it must follow these rules in the conduct of the trial itself. *Moore v. United States,* 429 U.S. 20, 97 S.Ct. 29, 50 L.Ed.2d 25 (1976); *United States v. Oates,* 560 F.2d 45, 63–84 (2d Cir. 1977). In addition, a defendant is entitled under the Sixth Amendment to confront and cross-examine the witnesses against him. *Pointer v. Texas,* 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1964); *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959).

In order to establish that Hernandez conspired with Ocampo and the other defendants to distribute cocaine, which was the sole charge against them, the government was required to prove some association between them in the alleged cocaine business. The January 28th meeting between Ocampo and Hernandez at the Burger King restaurant, followed by their departure in separate cars, their arrests, and the seizure from both autos, was probative but hardly conclusive on the issue of conspiracy. The only narcotics seized upon these arrests were found in Ocampo's car, with Hernandez' auto yielding U.S. currency and narcotics records. Each conceivably could have been engaged solely in a single transaction with the other. To buttress its evidence that Hernandez was a continuing member of the

Ocampo group and linked with Otero the government offered the hearsay testimony of Agent Mockler, based on information received from a "reliable informant" and "some documents" that were never identified, that Hernandez was "Negro" Pabon. Neither the informer nor the documents were produced.

The hearsay testimony permitted the jury to associate Hernandez, now identified through hearsay as "Negro," with Ocampo in the cocaine business since the papers seized from Ocampo's Ocean Parkway apartment and introduced into evidence showed a meeting scheduled with "Grone" (identified by Mockler as a code word for "Negro") at the "BK" (Burger King) at the very time when both met there on January 28 and another meeting scheduled with "Vic" (Otero) for January 31, at the time when Otero and Munoz arrived there. Mockler's testimony also permitted the jury to link Hernandez to Otero, from whose apartment the police seized a telephone record bearing the name "Negro" which was introduced at trial.

The admission of Agent Mockler's hearsay testimony, although permissible at the suppression hearing, was clear error at trial. The testimony did not qualify for admission under Fed.R.Evid. 803(19), 804(b)(4), as claimed by the government, or under any other exception to the Hearsay Rule. Hernandez was deprived of any opportunity to cross-examine the informant, who was the source of the identification, or to test the validity of Mockler's inferences based on the Patino documents, which evidenced various cocaine transactions between Patino and one "Negro" and listed among debits a $6,000 bond for "Negro" corresponding in amount and date to that forfeited by Hernandez on an earlier arrest. These documents were not introduced by the government.

We cannot accept the government's argument that the admission of Mockler's hearsay testimony was harmless error. Without Mockler's testimony the jury may have had doubts as to Hernandez' membership in a group consisting of Ocampo, Otero and Munoz. Any doubt on this score may well have been resolved by the Mockler testimony, upon which the jury could have relied in reaching its verdict. In his summation the federal prosecutor repeatedly pointed to Mockler's testimony as evidence that Hernandez was "Negro" and "Grone." The conviction of Hernandez must therefore be reversed and the case against him remanded for a new trial.

### Otero

Otero maintains that the stopping of his car on January 31 was an arrest, not a mere investigative stop, and that it was unsupported by probable cause. He also attacks the subsequent search leading to the discovery of the cash in the back seat of his car and the search of his apartment that night. These contentions must be rejected.

The agents testified without contradiction that they did not place Otero under arrest until after asking him his name and confirming their suspicion that he was the individual Ocampo was scheduled to meet according to the documents seized from Ocampo's apartment. Prior to arresting him the agents merely halted his movements and asked him to identify himself. No guns were drawn before the agents identified him. These actions are consistent with the limited investigative stop sanctioned in *Terry v. Ohio*, 329 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Once the agents found out, upon his production of his driver's license upon request, that he was Otero, they had probable cause to arrest him, based on the Ocampo documents which scheduled a meeting between Ocampo and "Vic" (identified by phone number, which was that of Otero) at that precise time and place for the purpose of trading in cocaine. Their action in making a limited intrusive stop to identify the person acting suspiciously before arresting him is consistent with the purposes of *Terry, supra*.

The piece of tape sealing the paper bag in the back of Otero's car did not transform the bag into a closed container subject to *Chadwick-Sanders-Dien* protec-

tion. Agent Mockler was able readily to identify its contents as wrapped currency simply by feeling the outside of the bag. Nor did the container appear to be of a type used for personal effects. Under the circumstances no expectation of privacy, judged by objective and reasonable standards, existed. *United States v. Mannino, supra,* 635 F.2d at 114. Where the contents of a container are easily discernible by frisking the exterior of a package, there is little likelihood that the owner could reasonably expect any substantial degree of privacy. Under such circumstances it would be a pointless formality to require that the agents first obtain a warrant before examining the contents. Accordingly, we hold that the bag's contents could be examined under what amounts to a "plain feel" version of the "plain view" doctrine. See *United States v. Diaz,* 577 F.2d 821, 824 (2d Cir. 1978). Nor did the partial covering of the bag with loose clothing create a reasonable expectation of privacy in the paper bag.

■ Otero's attack on the warrantless search of his apartment must be rejected for the reason that Judge Bartels, after taking into consideration the totality of the surrounding circumstances, found that Mrs. Otero knowingly and voluntarily consented to the search. His finding is supported not only by the agents' testimony but by her signature on the written consent form which was read by her in English and was read and explained to her in Spanish. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Judge Bartels found the testimony of Nora Otero "incredible in several key respects, which ultimately casts doubt on the veracity of all of her testimony." Most important, he disbelieved her statements that she knew no English and was therefore unable to understand the consent form she signed, noting that she had studied English in high school in Colombia for several years, that she had lived in the United States for seven years, that both her husband of five years and her two-year old daughter spoke English fluently, that she watched television shows in English and went to English language movies, and that she worked for three years in a mill in Brooklyn. We see no basis for overturning the decision of the trial judge, who observed the witnesses and carefully considered their conflicting testimony, to discredit Mrs. Otero's testimony, and to accept that of the agents.

*Munoz*

■ Like the other appellants, Munoz submits that his arrest was unsupported by probable cause. He also suggests that the evidence was insufficient to fit him into the conspiracy. We reject these contentions.

As soon as the agents found out Otero's name they had ample reason to conclude that Otero was involved in a drug transaction that had been aborted by the arrest of Ocampo three days earlier and that Munoz was riding along in the car in order to aid in the drug transaction. Munoz' actions supported this conclusion as well. Unlike the passenger in Ocampo's car on January 28, whose arrest the district court invalidated, Munoz moved around outside the car in the Burger King parking lot, appearing to be nervous, impatient and plainly helping Otero to look out for Ocampo's expected car and for unwanted onlookers in a way that indicated his awareness of the illegal activity that was planned. If these activities alone were insufficient to produce a jury question as to Munoz' participation in the conspiracy, the discovery of the loaded pistol under Munoz' seat and the bullet in his pocket provided a basis for finding that he was acting with knowledge as part of an organized narcotics trading organization.

*Conspiracy Charge*

■ Appellants finally claim that the court erred in refusing to instruct the jury regarding multiple conspiracies in addition to a single conspiracy. As we observed in *United States v. Cambindo Valencia,* 609 F.2d 603, 621 n.15 (2d Cir. 1979), "[W]here only one conspiracy is alleged and proved, the defendants are not entitled to a multiple conspiracy charge." Here, all of the evidence pointed to a single joint illegal narcotics enterprise rather than to a series

of smaller groups or isolated transactions. The documents seized from Ocampo and Otero, as well as the patterned, predicted activities of the appellants, suggest that the different cocaine traffickers knew about each other and traded as part of the same cocaine ring. In any event, as we observed in *United States v. Alessi*, 638 F.2d 466, 474–75 (1980):

> "Even if a variance existed in the proof, indicating that only smaller conspiracies had been shown, we would reverse as to an appellant only upon a showing that his substantial rights had been prejudiced.... No such prejudice appears here. There was no charge ... which allows one member of a conspiracy to be convicted for substantive offenses committed by another. No appellant points to any prejudicial testimony directed against him which was received as a co-conspirator's declaration that would otherwise constitute inadmissible hearsay....

> "While a prejudicial variance may become more likely as the number of improperly joined defendants increases, ... the number of persons tried together here (10 defendants) was sufficiently small to enable the jury to give individual consideration to each."

We find no merit in the other points raised by appellants. Judge Bartels did not abuse his discretion in limiting Otero's cross-examination of Detective Robinson. See *United States v. Cambindo Valencia*, 600 F.2d 603 (2d Cir. 1979).

The conviction of Hernandez is reversed and the case against him remanded for a new trial. The convictions of the other defendants are affirmed.