24-75-cr
*United States v. Poller*

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2024

(Argued: February 7, 2025      Decided: February 20, 2025)

No. 24-75-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

CHRISTOPHER POLLER,

*Defendant-Appellant.*

_____

Before:          PARKER, BIANCO, and NARDINI, *Circuit Judges.*

Defendant-Appellant Christopher Poller appeals from the judgment entered by the United States District Court for the District of Connecticut (Jeffrey A. Meyer, *Judge*) on January 4, 2024, convicting him on his plea of guilty to one count of possession with intent to distribute fentanyl and cocaine base, in violation

of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); and one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

As part of his plea agreement, Poller reserved the right to challenge the district court's denial of his motion to suppress evidence seized from his vehicle, which included the drugs and firearms that formed the basis for the charges to which he pleaded guilty. On appeal, Poller challenges the denial of that motion, arguing that the officers conducted an unconstitutional search by: (1) violating his reasonable expectation of privacy when the officers used iPhone cameras to see through the tinted windows of his car, and (2) physically intruding upon a constitutionally-protected area when they touched the exterior of his car during their efforts to see through the car's tinted windows. For the reasons set forth below, we conclude that: (1) Poller's expectation of privacy from all observation of the interior of his car was unreasonable, and the officers' use of their iPhone cameras to view the car interior did not transform those visual observations into "searches" under the Fourth Amendment; and (2) assuming, without deciding, that the officers' physical touching of the exterior of Poller's car constituted a trespassory "search," suppression is unwarranted because the trespass was not the but-for cause of obtaining the evidence. Accordingly, we **AFFIRM** the judgment of the district court.

> FOR APPELLEE: KATHERINE E. BOYLES, Assistant United States Attorney (Sandra S. Glover, Assistant United States Attorney, *on the brief*), *for* Marc H. Silverman, Acting United States Attorney for the District of Connecticut, New Haven, Connecticut.
>
> FOR DEFENDANT-APPELLANT: DANIEL M. ERWIN, Assistant Federal Defender, *for* Terence S. Ward, Federal Defender for the District of Connecticut, Hartford, Connecticut.

JOSEPH F. BIANCO, *Circuit Judge*:

Defendant-Appellant Christopher Poller appeals from the judgment entered by the United States District Court for the District of Connecticut (Jeffrey A. Meyer, *Judge*) on January 4, 2024, convicting him on his plea of guilty to one count of possession with intent to distribute fentanyl and cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); and one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). As part of his plea agreement, Poller reserved the right to challenge the district court's denial of his motion to suppress evidence seized from his vehicle, which included the drugs and firearms that formed the basis for the charges to which he pleaded guilty. On appeal, Poller challenges the denial of that motion, arguing that the officers conducted an unconstitutional search by: (1) violating his reasonable expectation of privacy when the officers used iPhone cameras to see through the tinted windows of his car, and (2) physically intruding upon a constitutionally-protected area when they touched the exterior of his car during their efforts to see through the car's tinted windows. For the reasons set forth below, we conclude that: (1) Poller's expectation of privacy from all observation of the interior of his car was unreasonable, and the officers' use of their iPhone

3

cameras to view the car interior did not transform those visual observations into "searches" under the Fourth Amendment; and (2) assuming, without deciding, that the officers' physical touching of the exterior of Poller's car constituted a trespassory "search," suppression is unwarranted because the trespass was not the but-for cause of obtaining the evidence. Accordingly, we **AFFIRM** the judgment of the district court.

## BACKGROUND[1]

On May 3, 2022, Waterbury Police Department officers were surveilling Christopher Poller's residence in preparation for his planned arrest. The officers had a search and seizure warrant for Poller's residence as part of a narcotics and weapons investigation. In addition, Poller was subject to an outstanding Connecticut state arrest warrant for parole abscondment. Through their surveillance, the officers observed Poller park a gray Acura sedan on a public street near his residence. Several unknown individuals then approached the car and exchanged items with Poller. Based on the officers' training and experience, they believed that those exchanges were consistent with hand-to-hand narcotics

---

[1] The following facts, which are not in dispute, are drawn from the Order Denying Motion to Suppress entered by Judge Meyer on July 14, 2023, as well as the appendices filed in this appeal, which include the officers' body-camera footage that Poller submitted as exhibits to his motion to suppress.

transactions. The officers then observed Poller exit the car and enter his apartment residence.

While one group of officers approached Poller's apartment to execute the search and arrest warrants, another group approached his car. The car's windows were tinted. One officer opened his iPhone's camera application and first placed the phone flush against, then later close to, but not touching, the passenger-side car window. Through his iPhone's camera application, he saw what he thought looked like "two 15s in the car," in reference to two firearms that were wedged between the front seats and the center console. Def. Ex. C, at 16:08:37–16:08:41. He then walked to the other side of the car and again held his iPhone's camera near the window, pointing out to another officer on his iPhone screen, "you got that one right there and that one over there," referring again to the two firearms in the car. *Id.* at 16:08:51–16:08:53. Another officer also used his iPhone camera to see through the passenger-side window, and noted to his colleague that he observed two firearms, including one with an extended magazine, and a bag containing an unknown substance. An officer then approached the front of the car, cupped his hands around his eyes, and looked into the front windshield without touching his hands, arms, or face to the glass. He stated, "I see a bag of heroin on the front seat,

two guns, one's got an extended mag, and looks like probably . . . a bag of drugs right there in the passenger seat." *Id.* at 16:09:39–16:09:54. His body camera also captured the interior of the car. *See* Gov't App'x at 79.

The officers then towed Poller's car and applied for and obtained a warrant to search the car. Inside, they found and seized the drugs and guns they had observed, which formed the basis for the charges to which Poller ultimately pleaded guilty.

Poller moved to suppress the evidence obtained from his car, arguing, *inter alia*, that the officers' observations into his car through iPhone cameras violated his reasonable expectation of privacy, and the officers' physical touching of his car during those observations constituted a trespassory search.[2] The late United States District Judge Jeffrey A. Meyer, in a characteristically well-reasoned and thorough opinion, denied the motion. *See generally United States v. Poller*, 682 F. Supp. 3d 226 (D. Conn. 2023). Judge Meyer first concluded that the officers' use of the iPhone cameras did not violate Poller's expectation of privacy because that

---

[2] Poller also argued below that the observations into his car occurred in the curtilage of his home, and that the officers impermissibly failed to disclose their use of iPhone cameras in their search warrant application. The district court rejected both arguments, *United States v. Poller*, 682 F. Supp. 3d 226, 233 (D. Conn. 2023), and Poller does not contest those determinations on appeal.

technology is in general public use. *Id.* at 231–32. He also dismissed Poller's trespassory search argument, finding that the physical touching of his car was not necessary for law enforcement to see the contraband inside. *Id.* at 233–34.

Poller subsequently pleaded guilty, pursuant to a conditional plea agreement that preserved his right to challenge the denial of his suppression motion, to one count of possession with intent to distribute fentanyl and cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). Following his guilty plea, the district court principally sentenced Poller to 84 months' imprisonment, followed by three years of supervised release. This appeal followed.

## DISCUSSION

"On an appeal challenging a district court's ruling on a motion to suppress evidence, we review its legal conclusions *de novo* and its findings of fact for clear error." *United States v. Iverson*, 897 F.3d 450, 459 (2d Cir. 2018). "In reviewing the denial of such a motion, we view the evidence in the light most favorable to the government." *United States v. Delva*, 858 F.3d 135, 148 (2d Cir. 2017) (alteration adopted) (internal quotation marks and citation omitted). "[W]e may affirm the

7

denial of the suppression motion on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely." *United States v. Estrada*, 430 F.3d 606, 609–10 (2d Cir. 2005) (internal quotation marks and citation omitted).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., amend. IV.  In assessing whether that right is implicated, we must first determine whether officers engaged in a "search."  "The Supreme Court has articulated two tests for determining whether a police officer's conduct constitutes a 'search' for purposes of the Fourth Amendment":  (1) "whether the officer violat[ed] a person's reasonable expectation of privacy," and (2) "whether the police officer physically intrud[ed] on a constitutionally protected area." *United States v. Weaver*, 9 F.4th 129, 141 (2d Cir. 2021) (en banc) (internal quotation marks, citations, and emphasis omitted). We assess how Poller fares under each test.

I.    **Reasonable Expectation of Privacy**

"If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no 'search'" subject to the Fourth Amendment. *Illinois v. Andreas*, 463 U.S. 765, 771 (1983).  The legitimate, or reasonable, expectation of

8

privacy test is a "two-part inquiry:  first, has the individual manifested a subjective expectation of privacy in the object of the challenged search?  Second, is society willing to recognize that expectation as reasonable?"  *California v. Ciraolo*, 476 U.S. 207, 211 (1986); *see Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, *J.*, concurring).

As a general matter, the Supreme Court has never "deviated from the understanding that mere visual observation does not constitute a search."  *United States v. Jones*, 565 U.S. 400, 412 (2012); *see Kyllo v. United States*, 533 U.S. 27, 32 (2001) ("[W]e have held that visual observation is no 'search' at all.").  That is because "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."  *Katz*, 389 U.S. at 351. Thus, an object "ordinarily in plain view of someone outside [an] automobile" is not "subject to a reasonable expectation of privacy."  *New York v. Class*, 475 U.S. 106, 118 (1986); *see United States v. Dunn*, 480 U.S. 294, 304 (1987) (noting that "the fact that the objects observed by the officers lay within an area that . . . was protected by the Fourth Amendment does not affect [the] conclusion" that the officers did not violate defendant's reasonable privacy expectations by observing those objects); *Ciraolo*, 476 U.S. at 213 ("The Fourth Amendment protection of the

9

home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares."). That proposition holds true even when the interior is not entirely visible to the naked eye and requires an officer to, for example, "shin[e] a flashlight to illuminate the inside of the vehicle." *Mollica v. Volker*, 229 F.3d 366, 369 (2d Cir. 2000); *see Texas v. Brown*, 460 U.S. 730, 739–40 (1983) (plurality of four Justices; other five Justices concurring in judgment and disagreeing on unrelated grounds) (It is "beyond dispute that [the officer's] action in shining his flashlight to illuminate the interior of [the defendant's] car trenched upon no right secured to the latter by the Fourth Amendment."); *id.* at 740 & n.5 (noting that "[n]umerous other courts have agreed that the use of artificial means to illuminate a darkened area simply does not constitute a search" and collecting cases); *United States v. Lee*, 274 U.S. 559, 563 (1927) (finding no search occurred where a searchlight illuminated contraband because the "use of a searchlight . . . is not prohibited by the Constitution"); *cf. United States v. Ocampo*, 650 F.2d 421, 427 (2d Cir. 1981) (in the seizure context, finding that "the agent's use of a flashlight did not keep the cash in the bag from being in 'plain view'"); *United States v. Delos-Rios*, 642 F.2d 42, 43 n.1 (2d Cir. 1981) (finding no Fourth Amendment issue with observations through binoculars of activities that occurred

10

on the street). Similarly, the Supreme Court has not deemed the use of a "precision aerial mapping camera" from as high as altitudes of "12,000, 3,000, and 1,200 feet" a search because "[t]he mere fact that human vision is enhanced somewhat, at least to the degree here, does not give rise to constitutional problems." *Dow Chem. Co. v. United States*, 476 U.S. 227, 229, 238 (1986).

Poller contends that this case is different because his car windows were tinted, and the officers required the assistance of technology—namely, iPhone cameras—to see through those windows. We are unpersuaded. As discussed below, consistent with the jurisprudence of the Supreme Court and this Court, we hold that the officers did not violate Poller's reasonable expectation of privacy by using iPhone cameras to observe the car's interior through its tinted windows, and therefore did not conduct a "search" within the meaning of the Fourth Amendment.

Poller first claims that because the tinted windows shielded the "inside of his car from the casual passerby," he "establish[ed] an expectation of privacy." Appellant's Br. at 12. However, the inquiry does not turn on whether Poller's employed safeguards would have sufficiently shielded the interior from the gaze of a mere casual observer. Instead, the Supreme Court has made clear that "[t]here

11

is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either *inquisitive passersby or diligent police officers*." *Brown*, 460 U.S. at 740 (emphasis added) (internal citations omitted); *cf. California v. Greenwood*, 486 U.S. 35, 40 (1988) (concluding that there was no reasonable expectation of privacy in garbage bags left at the curb in part because they are accessible to "scavengers" and "snoops"). Thus, in *California v. Ciraolo*, for example, the fact that the defendant "took normal precautions to maintain his privacy" by erecting a 10-foot fence around his backyard was insufficient to establish a reasonable expectation of privacy, in part because the fence might not shield the interior "from the eyes of a citizen or a policeman perched on top of a truck or a two-level bus." 476 U.S. at 211 (internal quotation marks and citation omitted); *see Florida v. Riley*, 488 U.S. 445, 450 (1989) (concluding that defendant "could not reasonably have expected the contents of his greenhouse to be immune from examination by an officer" from an aircraft above, even though he took precautions "against ground-level observation"). The pertinent question here, then, is whether the installation of tinted windows established a legitimate expectation of privacy from "*all* observations" of the interior of Poller's car. *Ciraolo*, 476 U.S. at 207. It does not.

Whatever Poller's subjective expectation of privacy may have been, his expectation that the installation of tinted windows shielded the car's interior from all observations is not a reasonable one. A reasonable expectation of privacy is "one that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (internal quotation marks and citation omitted). Poller's car was registered in Connecticut and was therefore subject to its motor vehicle laws. Under Connecticut law, both the front and side tinted window cannot be "mirror-like in appearance" and must have "a total light transmission of not less than thirty-five per cent plus or minus three per cent." Conn. Gen. Stat. Ann. § 14-99g(c)(1) & (5). Indeed, Poller conceded that "some light could still pass through his windows, as required by law," Appellant's Br. at 11, and further acknowledged at oral argument that the manifest purpose of the law's tint limitation was so people, including officers, would not be prevented from seeing into the vehicle, *see* Oral Arg. Tr. 23:11–23:34. This law, passed by a Connecticut legislature elected through the democratic process, evinces, at least to some degree, that society has not approved of tinted windows that conceal a car's interior from all view.

Furthermore, Poller's expectation of privacy was not reasonable because the window tint did not prevent passersby from observing the interior of his vehicle while parked on a public street. The "mere fact that an individual has taken measures to restrict some views of his activities" does not "preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." *Ciraolo*, 476 U.S. at 213; *see Riley* 488 U.S. at 450 (concluding that the defendant "could not reasonably have expected the contents of his greenhouse to be immune from examination by an officer" in navigable airspace because "the sides and roof of his greenhouse were left partially open," leaving its interior "subject to viewing from the air"). The record in this case alone demonstrates a number of ways in which an officer or private citizen could see through the car's tinted windows from the public vantage point of the street: by cupping his hands around his eyes to block out external light and leaning close to the window,[3] using an iPhone camera application, or utilizing any

---

[3] To be sure, the district court noted that while the officer "did not place his hands or his face on the windshield in order to see inside," it was a "fair inference that the detective's body was touching the side of the car as he attempted to look through the windshield." *Poller*, 682 F. Supp. 3d at 233. However, neither the record nor common sense suggests that a person would have needed to physically touch the car in order to have seen through the windshield.

number of widely available digital cameras.[4]  Given that the tinted windows continued to make the interior of Poller's vehicle susceptible to view by those standing outside of the car in a myriad of ways, Poller "knowingly expose[d] [the interior of the car] to the public" in a manner that "is not [] subject [to] Fourth Amendment protection."  *Ciraolo*, 476 U.S. at 213 (internal quotation marks and citation omitted).

Our conclusion that Poller's expectation of privacy from all observations of the interior of his car was unreasonable would normally be the end of the inquiry. Poller, however, maintains that under *Kyllo v. United States*, 533 U.S. 27 (2001), his reasonable expectation of privacy was nevertheless violated because the officers required the assistance of iPhone cameras to see into the car's interior.  We disagree.

---

[4]  In addition, other cases in our Circuit make clear that officers can often see through tinted windows by merely using a flashlight.  *See, e.g.*, *United States v. Feliz*, 657 F. Supp. 2d 364, 375 (E.D.N.Y. 2009) (crediting officers' testimony that they could "see through the tinted windows with their flashlights"); *United States v. Rookard*, No. 05-cr-332S, 2007 WL 2176895, at *5 (W.D.N.Y. July 27, 2007) (officer could see through "heavily tinted windows" by shining his patrol car spotlight onto the window), *aff'd*, 307 F. App'x 501 (2d Cir. 2009); *United States v. Hernandez*, 219 F. Supp. 2d 556, 559 (S.D.N.Y. 2002) (officer "used his flashlight to look through the tinted windows of the car"); *but see United States v. Amato*, No. 05-cr-384 (LTS), 2006 WL 800799, at *2 (S.D.N.Y. Mar. 29, 2006) ("The Court was not able to see through the rear passenger side window, which was heavily tinted black, with or without the aid of a flashlight.").

*Kyllo* asked "whether the use of a thermal-imaging device aimed at a private home from a public street to detect relative amounts of heat within the home constitutes a 'search' within the meaning of the Fourth Amendment." 533 U.S. at 29. In answering in the affirmative, the Supreme Court underscored the primacy of the home under the Fourth Amendment: "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Id.* at 31 (internal quotation marks and citation omitted). Indeed, "[i]n the home . . . *all* details are intimate details, because the entire area is held safe from prying government eyes." *Id.* at 37. Thus, the Court stated that while "it may be difficult to refine *Katz* when the search of areas such as . . . *automobiles* . . . is at issue," there was a "ready criterion, with roots deep in the common law" of the "expectation of privacy that exists" in the "interior of *homes*[,] the prototypical and hence most commonly litigated area of protected privacy." *Id.* at 34 (emphases added). In order to preserve this expectation of privacy within an individual's home, then, the Court held that "obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area constitutes a search—at least where

(as here) the technology in question is not in general public use." *Id.* (internal quotation marks and citation omitted). The Court, therefore, in its own words, drew both a "firm" and "bright" line at "the entrance to the house." *Id*. at 40.

Given *Kyllo*'s unmistakable reliance on the heightened privacy interests within the home, we conclude that its holding, and the reasoning on which it rests, generally does not extend to observations directed towards the interior of an automobile. *Kyllo* itself expressly acknowledged that the home was the critical factor differentiating its outcome from those cases where the Court deemed the use of advanced technology pointed at other types of property not to be a search. *Id*. at 33 ("While we upheld enhanced aerial photography of an industrial complex in *Dow Chemical*, we noted that we found it important that this is *not* an area immediately adjacent to a private home, where privacy expectations are most heightened." (internal quotation marks and citation omitted)); *see id*. at 37 ("*Dow Chemical*, however, involved enhanced aerial photography of an industrial complex, which does not share the Fourth Amendment sanctity of the home."). For that reason, our own Circuit has consistently declined to extend *Kyllo* beyond the context of the home. *See United States v. McKenzie*, 13 F.4th 223, 235 (2d Cir. 2021) (dismissing a *Kyllo*-based argument as applied to commercial storage units

and noting that "courts have declined to extend [the] protections against enhanced sensory instruments to non-residential properties"); *United States v. Haye*s, 551 F.3d 138, 145 (2d Cir. 2008) (dismissing a *Kyllo*-based argument because "in *Kyllo* . . . the means of detection was directed inside the defendant's home," whereas "[h]ere, the canine's sense of smell was directed towards an area 65 feet behind the back door of the home").

*Kyllo* similarly finds little applicability in the automotive context. The Supreme Court has "on numerous occasions pointed out that cars are not to be treated identically with houses or [a]partments for Fourth Amendment purposes." *Rakas v. Illinois*, 439 U.S. 128, 148 (1978). As the Court has explained, privacy expectations in an automobile are significantly diminished because, among other reasons, "it seldom serves as one's residence or as the repository of personal effects," "has little capacity for escaping public scrutiny," and, "unlike homes, [is] subject to pervasive and continuing governmental regulations and controls, including periodic inspection and licensing requirements." *Class*, 475 U.S. at 112–13 (internal quotation marks and citations omitted). In short, automobiles simply

18

"do not present the privacy interests associated with the 'intimate details' of one's life which are inherently associated with the home."[5]  *McKenzie*, 13 F.4th at 235.

Moreover, we are not persuaded that the kind of technology about which *Kyllo* expressed concerns is present here.  *Kyllo* feared the encroachment upon privacy by "sense-enhancing technology" that could glean "information regarding the interior of the home that could not otherwise have been obtained without physical intrusion."  533 U.S. at 34 (internal quotation marks and citation omitted).  In other words, *Kyllo* guarded against those technologies, such as thermal-imaging devices, that "do not so much enhance police senses as they do replace them with something superhuman, an ability to perceive that people simply do not have."  Appellant's Br. at 31 (quoting David A. Harris, *Superman's X-Ray Vision and the Fourth Amendment: The New Gun Detection Technology*, 69 Temp. L. Rev. 1, 24 (1996)).  By contrast, the iPhone camera here only aided the officers in viewing what they undisputably could see with their naked eyes.  We therefore cannot say

---

[5]  Poller suggests that "for many, the car is not inherently less valuable than the home; in fact, many consider their car to be their home."  Appellant's Br. at 28.  However, Poller does not argue, nor does the record reflect, that he utilized his car as a home.  As the Supreme Court has made clear, "Fourth Amendment cases must be decided on the facts of each case, not by extravagant generalizations."  *Dow Chem. Co.*, 476 U.S. at 239 n.5.  Thus, "we have never held that potential, as opposed to actual, invasions of privacy constitute searches for purposes of the Fourth Amendment."  *Id.* (internal quotation marks and citation omitted).

that the use of an iPhone camera here compared to the use of cameras and illumination devices generally, which the Supreme Court has consistently sanctioned, differs by an order of constitutional magnitude. *See Dow Chem. Co.*, 476 U.S. at 238; *Brown*, 460 U.S. at 739–40; *Lee*, 274 U.S. at 563. As in *Dow Chemical*, the officers here were "not employing some unique sensory device that, for example, could penetrate the walls of buildings . . . but rather a conventional . . . commercial camera."[6] 476 U.S. at 238.

---

[6] In reaching its decision, the district court noted that "*Kyllo* itself suggests that the use of technology is not a search when the technology is both widely available and routinely used by the general public." *Poller*, 682 F. Supp. 3d at 231 (quoting *Naperville Smart Meter Awareness v. City of Naperville*, 900 F.3d 521, 527 (7th Cir. 2018)); *see United States v. Hay*, 95 F.4th 1304, 1314 (10th Cir. 2024) ("The Supreme Court's guideposts are clear: . . . viewing settings that are in public view, or visible via generally available technology, does not constitute a search."). Based upon that reading of *Kyllo*, the district court held that "the use by law enforcement of technology that is in general public use does not—without more—violate a person's reasonable expectation of privacy." *Poller*, 682 F. Supp. 3d at 231. As an initial matter, we are not certain that *Kyllo* should be read so expansively. As discussed *supra*, *Kyllo* held that the use of sense-enhancing technology constitutes a search "*at least* where (as here) the technology in question is not in general public use." 533 U.S. at 34 (emphasis added). That phrase leaves open the possibility that the use of even a technology in general public use may nevertheless be a search. Moreover, the broad interpretation of *Kyllo* is potentially at odds with its mandate that we must "assure[] preservation of that degree of privacy [in the home] against government that existed when the Fourth Amendment was adopted," because the home "is held safe from prying government eyes." *Id.* at 34, 37. We would struggle mightily to preserve such minimum privacy expectations in the home if technological devices, no matter how intrusive, may be utilized by the government with impunity against a home, without Fourth Amendment limitations, so long as those devices are in general public use.

In addition, adopting a *per se* rule that any utilization of technology in general public use cannot constitute a search for Fourth Amendment purposes would require us to answer complicated questions about the proper contours of such a rule. What level of generality should we use to define the technology in question? *Compare Florida v. Jardines*, 569 U.S. 1, 14–15 (2013) (Kagan, *J.*, concurring) (concluding that there was a search because "a trained drug-detection dog" is not in general public use), *with id.* at 16–17 (Alito, *J.*, dissenting) (concluding there was no search in part because dogs in general "were ubiquitous . . . at the time of the adoption of the Fourth Amendment"). How should we quantify when a technology is sufficiently in general public use? *See, e.g., Kyllo*, 533 U.S. at 47 (Stevens, *J.*, dissenting) ("[H]ow much use is general public use is not even hinted at by the Court's opinion"); *Naperville*, 900 F.3d at 526–27 (concluding summarily that "[w]hile more and more energy providers are encouraging (or in this case forcing) their customers to permit the installation of smart meters, the meters are not yet so pervasive that they fall into [the general public use] class"). What group(s) constitute the public? *See, e.g., Dow Chem. Co.*, 476 U.S. at 238 (suggesting that a "precise, commercial camera commonly used in mapmaking" was sufficiently available to the public); *Naperville*, 900 F.3d at 527 (concluding that smart meters were not in general public use because they "have been adopted only by a portion of a highly specialized industry"); App'x at 56 (district court suggesting that because thieves use the iPhone camera application, and "thieves [are] members of the public," that fact "pretty much disprove[d]" Poller's "*Kyllo* argument, which relies on it not being in general public use"). And, most pertinent to this case, what relevance, if any, does the manner in which the general public uses the technology matter? *See* Christopher Slobogin, *Peeping Techno-Toms and the Fourth Amendment: Seeing Through Kyllo's Rules Governing Technological Surveillance*, 86 Minn. L. Rev. 1393, 1405 (2002) ("Most of these devices, even if generally available and used by large segments of the public, are not usually used the way police use them."). Indeed, the district court here recognized that "[n]o doubt some people may be surprised to learn that the ordinary camera function of an iPhone can be used to see through the tint of car windows." *Poller*, 682 F. Supp. 3d at 231–32. Insofar as the general public use consideration is premised on the notion that "a reasonable expectation of privacy depends on the chance that a sensible person would predict that he would maintain his privacy," how the technology at issue is ordinarily used may well be a necessary inquiry. Orin Kerr, *Four Models of Fourth Amendment Protection*, 60 Stan. L. Rev. 503, 508 (2007). All that being said, because we conclude that *Kyllo* does not apply here for the reasons discussed *supra*, we need not, and do not, rely on the fact that iPhone cameras are in general public use in reaching the conclusion that no search occurred here.

In sum, we conclude that the officers' use of iPhone cameras to aid them in seeing through the tinted windows of Poller's car did not violate Poller's reasonable expectations of privacy, and therefore was not a "search" within the meaning of the Fourth Amendment.[7]

## II. Physical Intrusion

In the alternative, Poller argues that, by repeatedly touching Poller's car while looking into its interior, the officers engaged in a trespassory search under *United States v. Jones*, 565 U.S. 400 (2012).

In *Jones*, the Supreme Court revived the property-based "common-law trespassory test" for determining whether the government conducted a search under the Fourth Amendment. *Id.* at 409. There, the government installed a GPS tracking device on the undercarriage of a Jeep and then monitored the Jeep's movements for a four-week period. *Id.* at 403. The Court concluded that, under

---

[7] In so holding, we should not be misconstrued as announcing a bright-line rule that the use of any sense-enhancing technology is excluded from the ambit of Fourth Amendment scrutiny, so long as it is directed at an automobile. We leave open the possibility that a sufficiently intrusive technology aimed at an automobile may so significantly trample on settled privacy expectations to constitute a search. That, however, is not this case.

the trespass inquiry, this constituted a search because the government "physically occupied private property for the purpose of obtaining information."[8]  *Id.* at 404.

Since *Jones*, courts have sharply divided over the proper scope and application of this trespassory-search test.[9]  We, however, need not add our own

---

[8]  In a concurring opinion, Justice Alito, joined by three other Justices, understood the majority's test to suggest that any "conduct that might have provided grounds in 1791 for a suit for trespass to chattels" might constitute a Fourth Amendment search, and that "[a]t common law, a suit for trespass to chattels could be maintained if there was a violation of the dignitary interest in the inviolability of chattels."  *Id.* at 419 & n.2 (Alito, *J.*, concurring) (internal quotation marks and citation omitted).

[9]  *Compare United States v. Richmond*, 915 F.3d 352, 358 (5th Cir. 2019) (concluding the "act of tapping tires" with an investigatory purpose was a search because there was "no difference between the *Jones* device touching the car and an officer touching the tire"); *Taylor v. City of Saginaw*, 922 F.3d 328, 332–33 (6th Cir. 2019) (finding that chalking a car tire was a search because it constituted a trespass to chattel at common law and was done with an investigatory purpose); *with United States v. Gorham*, No. 23-cr-0206 (ABJ), 2024 WL 111776, at *6 (D.D.C. Jan. 10, 2024) ("[T]here is no point in the *Jones* opinion where the Court characterizes the mere 'touching' of a vehicle—even for the purpose of gathering information—as a 'trespass'; the objectional conduct was the physical intrusion into, or encroachment upon, private property."); *United States v. Acuna*, No. 21-10035 (JWB), 2022 WL 3081419, at *6 (D. Kan. Aug. 3, 2022) ("[T]he court finds no authority for the proposition that the momentary light touch of the exterior of a vehicle or other personal conveyance by a dog—or a person, for that matter—on a public roadside, amounted to a trespass at common law."); *United States v. Owens*, No. 15-cr-55 (NT), 2015 WL 6445320, at *9 (D. Me. Oct. 23, 2015) (concluding "it is a stretch to describe this type of momentary contact with the outside of an inanimate object as an 'intrusion' upon the Defendant's effect"), *aff'd on other grounds*, 917 F.3d 26 (1st Cir. 2019); *State v. Bauler*, 8 N.W.3d 892, 900 (Iowa 2024) (finding that a search dog's "fleeting contact with the exterior of a vehicle" "did not involve an extended physical occupation or physical intrusion akin to that in *Jones*"); *see also State v. Dorff*, 526 P.3d 988, 997–99 (2023) (noting that "personal property interests protected by the Fourth Amendment . . . are not implicated by forms of contact that are less than 'intermeddling'" and leaving open the

voice to the debate at this time.  Even assuming a trespassory search occurred here, suppression is unwarranted because the search was not the but-for cause of the officers' acquisition of the challenged evidence.

"The Supreme Court has long held 'but-for' causation to be an irreducible baseline requirement before a court may even begin to consider whether the remedy of suppression is justified on the specific facts of a case."  *United States v. Pabon*, 871 F.3d 164, 179 (2d Cir. 2017); *see Hudson v. Michigan*, 547 U.S. 586, 592 (2006) ("Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression."); *Segura v. United States*, 468 U.S. 796, 815 (1984) ("[O]ur cases make clear that evidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence.").

Here, Poller cannot establish the requisite causal link because he conceded to the district court "that it was not necessary for the iPhone to be in physical contact with the car in order for the camera function to allow the police to see the contents inside."  *Poller*, 682 F. Supp. 3d at 232.  On appeal, Poller does not contest that he made this concession below.  *See, e.g.*, Appellant's Br. at 4 (stating that the

---

question of "whether an officer conducts a 'search' as he leans against the vehicle . . . and contorts his head to claim he saw contraband within the vehicle in 'open view'" (emphasis omitted)), *cert. denied*, 144 S. Ct. 249 (2023).

detective placed "his phone on the passenger-side window and then near it").[10]

Thus, "whether or not the constitutional violation occurred" (the touching of the vehicle that we are assuming, without deciding, was a trespassory search), the officers' observation of the guns through the use of the iPhone cameras, without coming into contact with the car, would have established the requisite probable cause to support an eventual warrant, and led to the discovery and seizure of the guns, as well as the drugs, in the car upon its execution.[11] *Hudson*, 547 U.S. at 615. Accordingly, suppression of the guns and drugs recovered from Poller's car is not warranted.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

[10] In passing, Poller suggests that the maintenance of a "*de minim[i]s* distance between the window and [the officers'] camera lenses" constituted a physical intrusion into his effects. Appellant's Br. at 9; *see id.* at 36. However, Poller does not provide any authority in support of that proposition, and we are aware of none.

[11] Poller also suggests that the physical touching of the car was necessary because the officers needed to "lean[] onto the car to access a better vantage point" in order to "confirm their findings." Reply Br. at 15. To the contrary, the record demonstrates that two different officers, on three occasions, were able to clearly identify the two firearms in Poller's car through their iPhone cameras. Because the officers knew that Poller had a prior felony conviction, as he was subject to an active arrest warrant for parole abscondment, those observations provided, at a minimum, probable cause that Poller criminally possessed a firearm as a convicted felon. *See* Conn. Gen. Stat. Ann. § 53a-217. In turn, the officers, through those observations alone, had the requisite probable cause that the car contained evidence of that crime necessary for a car search warrant.